THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAURICE DuPREE, Defendant-Appellant.

Second District   No. 2—07—1276

Opinion filed January 6, 2010.

Thomas A. Lilien and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HUDSON delivered the opinion of the court:

Defendant, Maurice DuPree, appeals the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 2006)) from his conviction by a jury of first-degree murder (720 ILCS 5/9—1(a) (West 1998)). Defendant contends that his petition sets out the gist of meritorious claims that (1) he was denied his constitutional right to be present at the jury instructions conference at which his attorneys decided not to tender an instruction on second-degree murder (720 ILCS 5/9—2(a) (West 1998)); and (2) he was denied his right to decide personally whether to tender an instruction on second-degree murder. We agree with defendant's second argument, and we reverse and remand.

Defendant was charged with the murder of Ramon Friar. At his trial, held in November 1998, he alleged that he had acted in self-defense. The jury found him guilty, and he was sentenced to 40 years'

imprisonment. We summarize the pertinent evidence and proceedings from defendant's trial.

Velma Barnes testified that, at about 11 a.m. on February 9, 1998, she was at home at 516 May Street in Waukegan when she saw two men talking in front of 515 May, then heard two shots in quick succession. One man fell backward onto the ground, and the other man, who was wearing a hood, ran away toward McAlister Street. Another man ran to the victim. As Barnes called the police, she heard more shots, perhaps three or four in all. From a fence near McAlister, the hooded man was shooting; Barnes saw his gun. She also saw a white car on May drive off toward McAlister. Barnes went outside and recognized the fallen man as Friar. At no time had she seen him with a gun.

Maria Montejano testified that, at about 11 a.m. on February 9, 1998, she went outside and saw "a lot of people arguing" in the area of 515 and 519 May. Montejano went indoors for five minutes, then entered her backyard. She heard a shot and, after about five seconds, a second shot. She ran out front and heard three or four more shots. Montejano turned and saw a man lying on the sidewalk, another man standing nearby, and 10 or 15 other people "scattering out." She never saw anybody with a gun.

DeShaude Jones testified as follows. He belonged to the Four Corner Hustlers, a rival of the Gangster Disciples. Friar and Jeff Henley were Four Corner Hustlers. Jones was a friend of Keany Parks even though Parks was a Gangster Disciple. On February 9, 1998, at about 11 a.m., Friar and Jones were dropped off at Henley's home at 522 May. Jones entered the home and went into Henley's room, but Friar stayed outside. Parks and Courtney Boyd were also in Henley's room. After a few minutes, Jones looked out and saw Friar arguing with a tall man standing across the street in front of 519 May. Jones stepped outside. Shortly afterward, defendant exited 519 May, carrying a baseball bat. He stood next to the tall man. Jones and Friar crossed the street and stood about five feet from defendant. Friar asked defendant whom he was going to hit with the bat. Parks then exited Henley's house and asked what was going on. He told the tall man and defendant to go back inside 519 May, where Parks lived; they did. Jones and Friar returned to the sidewalk outside 522 May. Soon afterward, Henley came outside. The tall man, defendant, and a woman exited 519 May, descended the back stairs, and walked toward a white car parked in front of 515 May. Parks stood by the stairs. Defendant did not then have the bat. His hands were in his pockets. As the three people exited 519 May, Jones and Friar crossed the street toward 515 May. The tall man and the woman entered the car and drove off. Defendant stood outside, his hands in the pockets of his hooded jacket.

Jones suggested to Friar that they stop walking toward defendant. Neither Jones, Henley, nor Friar had a gun. Friar took another step. Jones tried to pull him back. Defendant raised his right hand, pulled out a handgun, and shot Friar once in the chest. The white car sped off toward McAlister. Defendant turned and ran toward McAlister. Jones saw Friar lying in the middle of the street and ran over to him. He then heard about three more shots. The police arrived, and Jones left.

Jeff Henley testified as follows. On February 9, 1998, he lived at 522 May and was a Four Corner Hustler. Parks lived at 519 May and was a Gangster Disciple, but he and Henley were friends. That day, Parks and Boyd were visiting Henley. A few minutes after Parks left, Henley heard loud talking outside. He looked out the window and saw Friar and Jones near the curb at 522 May. Two strange men were standing in the driveway of 519 May. One was tall and one, defendant, wore a hooded jacket. A third man was nearby. Friar stepped into the middle of the street, and the tall man picked up a stick. Friar took off his coat, and all four men kept arguing. Parks, who had been standing by the stairs, stepped forward and said a few words to the tall man and defendant. The three of them entered 519 May. Henley entered 522 May, and Jones and Friar returned to the sidewalk in front.

Henley testified that, as Jones and Friar stood talking, six people exited 519 May and entered Parks's van. The group included Parks, his girlfriend Yolanda Virto, and Judon Hall, a Gangster Disciple. Next, the tall man, defendant, and a woman exited 519 May and stood outside 515 May. The tall man and the woman entered a Ford LTD, but defendant stayed outside, his hood up, one hand in his pocket, and the other at his side. Friar was in the middle of the street, and Jones was across the street outside 522 May. Friar moved onto the grass near the sidewalk and asked defendant, "What you gonna do?" and "You want to scrap?" Friar was holding his hands at his sides with his palms facing forward. Friar stepped closer; he still had his hands open and was telling defendant, "Let's box. Let's scrap." Parks was backing his van out of the driveway. Defendant took two steps back and stopped. He may have said that he "didn't want no trouble," but Henley could not recall for sure.

Henley testified that defendant pulled a gun from his jacket and shot Friar once. Friar fell to the ground; defendant took off running. Jones and Henley ran to Friar. Parks had returned and exited his van, and the white car had sped away. Parks pulled out a gun but did not fire it. Henley heard more gunshots. Henley never saw Friar or Jones with a gun. He was not carrying one either.

Yolanda Virto testified as follows. She was Parks's girlfriend. At about 11 a.m. on February 9, 1998, Virto, Parks, defendant, and defendant's girlfriend were at Parks's house at 519 May. Parks went to 522 May. Friar was standing on the sidewalk outside 522 May. A man named Jason was standing outside 519 May. Eventually, Parks exited 522 May and entered 519 May, where he spoke with Jason, Judon Hall, and defendant. Those men and Virto then exited the house; defendant was carrying a baseball bat. Henley was standing in front of the driveway at 519 May and had a gun, which he pointed at Virto and her friends as they sat on the stairs. Virto's group went next door to her friend Bonnie's house. Virto heard a shot; after about a minute, she heard two more shots. She exited Bonnie's house. Parks entered a car and left, and Virto reentered Bonnie's house. About five minutes later, she looked out and saw Friar lying in front of 515 May. Jones was near him, and the police had arrived. Virto never saw Friar or Jones with a gun.

Courtney Boyd testified as follows. On February 9, 1998, he was in the group at Henley's house. Parks, Henley, and Boyd left the house when someone said that Friar was outside arguing with two men. Friar was standing in front of 516 May, by himself. Two men, one of whom Boyd later identified as defendant, were standing in Parks's driveway at 519 May and exchanging words with Friar. Boyd, Jones, Henley, and Friar crossed the street and stood in between 519 May and 515 May. The two other men spoke a little more, then entered 519 May. Boyd, Jones, Henley, and Friar returned to the sidewalk in front of 522 May. Boyd entered a car and rode off to get a gun. To his knowledge, Henley did not have a gun, and neither did Friar or Boyd's other friends. About eight minutes later, after picking up the gun, he returned and saw police cars and an ambulance in the area.

Keenan Young testified as follows. On February 9, 1998, at about 11 a.m., as he was walking on McAlister toward May, he saw several men standing in front of Parks's driveway. Two of them, Jones and Friar, were standing in the street, and the others, including defendant, were standing on the sidewalk. Young heard arguing. The next thing he heard was a gunshot. He then saw defendant running through an alley, holding his hood against his head and his clenched right hand in his jacket pocket. A white Ford LTD sped off two or three seconds after the shot was fired. Young ran into a store on McAlister. When he came out, defendant was running on McAlister toward May. His right hand was still in his pocket. Young reentered the store and heard five or six more gunshots, apparently from the corner near 515 May. He had not seen any guns the whole time.

Diana Moore testified as follows. On February 9, 1998, she was at home at 515 May when she heard "loud" and "mean" voices coming from 519 May. Moore looked out and saw two men, one of whom she later identified as defendant, arguing. Moore turned away but soon heard a gunshot. She turned around. About five seconds after the first shot, she heard "a whole bunch of gunshots." She saw no guns. Moore called the police, then looked out the window. She saw a body on the ground, a man holding the body, and two people running down the street.

Waukegan police detective Mark Tkadletz testified that, on April 23, 1998, he and Detective Yarc interviewed defendant, who signed a statement that said the following. On February 9, 1998, defendant, Rita Jones, Antoine Woods, and Jason rode from Chicago to Parks's house, where they, Parks, and Virto socialized. Jason went outside to smoke. After a while, Virto said that "some guys" were "trying to pull it" with Jason. Defendant grabbed a baseball bat and, with the others, went outside. Defendant's statement continued:

"I asked JAYSON [sic], 'what's going on?' He said that these guys were talking crazy and showin [sic] us guns. I asked him what he wants [sic] to do and he said, 'fuck these niggers, we can box.'

Just after that the fat guy and [Friar] were outside. [Friar] came across the street and said that we don't belong here and that we don't fuck with [Gangster Disciples]. [Friar] came across the street and stepped up on the curb. Just after that KEANY came from the house that was next door and then went into his house and up the stairs. I saw him in the window up in the house. He came out and walked up behind us with a gun.

The fat kid then pulled out a Tec. I don't know what kind it was. He had the gun and shot at the guy by the white car. This is when everything kicked off. [Friar] pulled out a gun and KEANY pulled out his. That is when I saw KEANY shoot the dude. KEANY was just over my right shoulder right behind me. The gun that Keany had was a small black hand gun."

Defendant said that he ran to the grocery store, where "they started to shoot at [him] again." He eventually took a bus to Chicago.

Jonathan Oliver of the Waukegan police department testified that, on April 23, 1998, after defendant had spoken to Tkadletz and Yarc, he (defendant) volunteered to talk to Oliver. Oliver interviewed him and typed up a statement reading, in part:

"I asked Jason if he was straight, and he said 'Nah, these mugs is trying to pull it with me.' There was a fat guy across the street with another guy who I think is named Mo'Mo [Friar's nickname]. They showed us their straps [guns]. They came towards us as three of there [sic] friends stayed by their house. My man Dee was stand-

ing by Rita's car and he started having words with the fat guy. Mo'Mo told us 'You don't belong around here, we don't fuck around with [Gangster Disciples]', basically threatening us. As Dee was arguing with the fat guy, Kiyani [*sic*] came walking behind me. The fat guy up'd [*sic*] his tek [*sic*] 9 and started shooting at Dee. At the same time Mo'Mo pulled out a gun from his waistband and aimed it at me. Thinking I was going to die, I grabbed Kiyani's [*sic*] gun that he had in his hand and shot Mo'Mo. I took off running down the alley and all hell broke loose. The fat guy with the tek [*sic*] started shooting at me[,] so as I was running I shot back at him four or five times to protect myself. I ran behind a mechanic shop and I saw Kiyani [*sic*] running by his house. I ran to the street with the grocery store on the corner that meets with May and I saw the fat guy running towards me with the other guys by Mo'Mo laying [*sic*] on the ground. Thinking the fat guy was going to keep shooting at me[,] I took off running down the main street."

Waukegan police sergeant Robert Kerkorian, qualified as an expert on gangs, testified as follows. In the Waukegan-North Chicago area, the Four Corner Hustlers and Gangster Disciples are enemies but usually stay out of each other's way so that both can profitably sell drugs. Waukegan gangs do not like Chicago gang members coming there, as they fear competition in the drug trade. This fear has caused confrontations in the past, including some shootings and killings. If a gang member from Chicago enters a rival gang's territory and one of the rival gang members disrespects him, he can gain respect from his fellows by acting against the other person. If he backs down, he will lose respect and might get beaten or otherwise punished.

Kerkorian testified that Friar had held a high position within the Four Corner Hustlers. A Chicago Gangster Disciple's mere entry into the area of May and McAlister "possibl[y]" could be taken by Four Corner Hustlers as disrespectful, and they likely would try to make him leave. If someone of Friar's rank did not make that effort, he could lose his rank and much prestige. Usually, the Four Corner Hustlers, like other Waukegan gangs, precipitate an event with some form of violence not involving firearms, although the fight may escalate to the use of firearms. In confronting a Chicago Gangster Disciple, a Waukegan Four Corner Hustler would likely use something other than a firearm. In many Waukegan gang fights, guns are displayed but never used.

The State rested. Defendant called Stephen Scheller of the State's Attorney's office. He testified that during the grand jury proceedings, he asked Henley whether, before defendant shot Friar, Henley heard defendant say anything to Friar. Henley answered, "I think he told him 'all right, dude. I don't want no trouble.' "

Willie Wise testified that he had known Friar for six or seven years. Friar had been a "three star branch elite" in the gang, "[s]omething like" the top man in the Waukegan area, but "not the top top man." The first time that Wise had seen Friar pull out a gun and point it at someone was about four years before the trial, when Friar shot a rival gang member who was riding by in a car. The last time was two years before the trial, when Friar hid a gun under the porch of Wise's house. Friar's reputation in the community was "not good"; he was a "violent person."

Keany Parks testified as follows. On February 9, 1998, at about 10:45 a.m., he left his home at 519 May and went to Henley's home at 522 May. About 10 minutes later, he left and saw Jason standing in front of 519 May and Friar standing across the street from Jason. Friar and Jason were having words. Parks crossed the street and spoke with Jason. At that point, Friar started to cross the street, and, now accompanied by Jones, he and Jason continued to have words. Henley had come out, and Friar motioned to him to bring a gun. Henley had a Tec-9. Friar told Parks that he "wasn't supposed to have the nigger down." While Parks was outside, he never saw Friar with a gun.

After the trial judge questioned defendant and ascertained that he did not want to testify, the parties rested, the jury was dismissed for the day, and the judge and the parties proceeded directly to an instructions conference. The report of proceedings does not explicitly state whether defendant was present at the conference. It shows that his attorneys, Theodore Potkonjak and Michael Conway, were present, although Conway said little. At the conference, the following colloquy took place:

"MR. POTKONJAK: *** Judge, we are going to be requesting second degree murder—second degree instructions be in.

THE COURT: They are submitting a second degree.

MR. MORRISON [assistant State's Attorney]: Later on we are, Judge—I guess we are. It's here, Judge, because—

THE COURT: Are you submitting a second degree instruction?

MR. MORRISON: We would first be submitting—our first option would be to submit the instructions to the jury on first degree only."

Eventually, the judge ruled that, under *People v. O'Neal*, 104 Ill. 2d 399, 405-06 (1984), because defendant was entitled to an instruction on self-defense, he was also entitled to one on second-degree murder. The following exchange ensued:

"THE COURT: Where there is evidence in the record to support a self-defense instruction, a voluntary manslaughter [the former

name for second-degree murder] instruction must also be given if tendered by the defendant. Okay. Let's go.

MR. POTKONJAK: Judge, we've gone through it with my client, and we are going to withdraw the second degree instructions and just go with self-defense.

THE COURT: So you are asking—you are agreeing to proceed only with first degree murder and the self-defense?

MR. POTKONJAK: Yes, Judge. That's my client's decision after speaking with him."

The judge and counsel then went through the instructions some more. The following exchange ensued:

"THE COURT: Anything else?

MR. POTKONJAK: Now, the only other thing, Judge, I would ask to put on the record is while we were doing this after we had elected not to go second degree Mr. Conway called me over and I spoke with my client again saying he did not realize that your ruling was that he could have second degree and self-defense issues both given at the same time.

THE COURT: My ruling is according to the case that I've been handed he is entitled to it.

MR. POTKONJAK: He thought your ruling was the opposite, you can only have one or the other. I explained to him no, he could have both if he wanted. We had further conversation about that, and notwithstanding the fact that he knows he could have both second degree murder instructions and self-defense instructions, he still made the decision to go with just a self-defense instruction. It's basically now or never.

THE COURT: Okay. See you tomorrow morning."

The next morning, the court held a brief instructions conference. Defendant was present. Morrison submitted two verdict forms, allowing the jury to find defendant either guilty of first-degree murder or not guilty. Conway responded, "No objection." The conference speedily concluded. Later, the jury found defendant guilty.

Defendant obtained new counsel and moved for a new trial, alleging that Potkonjak and Conway had been ineffective for failing to locate potential witnesses. The trial court denied the motion and subsequently sentenced defendant to 40 years in prison. On appeal, he argued that the court erred in admitting Kerkorian's testimony and that he was entitled to one more day of sentencing credit. We rejected the first claim, granted the credit, and affirmed the judgment as modified. *People v. DuPree*, No. 2—99—0500 (2000) (unpublished order under Supreme Court Rule 23).

On September 12, 2007, defendant filed his *pro se* petition under the Act. He alleged that (1) he was denied his constitutional right to

be present at the first jury instructions conference; (2) his attorneys did not properly consult with him before withdrawing their request for an instruction on second-degree murder; and (3) the trial court failed to ascertain whether he wanted an instruction on second-degree murder. Defendant's petition attached his affidavit, in which he stated:

"On November 12, 1998, the fourth day of my trial, and after the defense rested our case, Judge Walters [*sic*] dismissed the jury. I was taken from the court room [*sic*] to the holding area. Sitting their [*sic*] for an unknown amount of time, one of my attornies [*sic*] (Michael Conway) came spoke [*sic*] to me. Conway said that we got both second degree instructions in but we have a better chance with just self-defense, and was I sure I wanted to give the jury something to hang their hat on. I told Conway that I want [*sic*] to go home but if I had to be convicted I rather [*sic*] go down for second degree than first. Conway said that he would talk to Ted (Potkonjak) and see what he says [*sic*]. Conway then left. About 10 to 15 minutes later, Conway returned and said that, [']We've decided to only go with self-defense, it's best for you because with your class one conviction if your [*sic*] [found] guilty you'll be facing murder time any way [*sic*] then you could appeal.['] Conway then steped [*sic*] away from the door saying he had to get back, then left. I did not see him or Ted until the next day at the start of trial or just before trial. Neither said anything about the instructions. When I did next see Ted he asked was I ready to go home, and I was."

The trial court dismissed the petition summarily. The court explained that, under *People v. Griffith*, 158 Ill. 2d 476 (1994), the choice of jury instructions to tender was the prerogative of defendant's attorneys and that they had consulted defendant about the choice. Further, defendant's claims were forfeited because he could have raised them on direct appeal. Defendant timely appealed.

On appeal, defendant contends that the summary dismissal of his postconviction petition was error because the petition raised the gist of meritorious claims that he was denied his constitutional rights (1) to be present at the first jury instructions conference; and (2) to decide personally whether to tender a jury instruction on second-degree murder. For the reasons that follow, we disagree with defendant's first contention but we find his second argument well taken.

We review *de novo* the summary dismissal of a postconviction petition. *People v. Foster*, 391 Ill. App. 3d 487, 491 (2009). To survive summary dismissal, a petition need state only the gist of a meritorious claim that the defendant's constitutional rights were violated. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At this preliminary stage, the petition's allegations of fact must be taken as true unless the record contradicts them. *Edwards*, 197 Ill. 2d at 244.

We turn to defendant's first claim: that he was denied his constitutional right to be present at the first jury instructions conference. Defendant relies on the general principle that a defendant has a due process right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *People v. Lofton*, 194 Ill. 2d 40, 67 (2000); see generally *United States v. Gagnon*, 470 U.S. 522, 526, 84 L. Ed. 2d 486, 490, 105 S. Ct. 1482, 1484 (1985). He contends generally that a jury instructions conference is such a critical stage because instructing the jury correctly is essential to ensuring a fair trial. He contends specifically that he should have been allowed to attend the first jury instructions conference because he could have objected when his counsel withdrew the request to tender the instruction on second-degree murder.

■ The State argues initially that defendant has forfeited his claim by failing to raise it in his posttrial motion or on his direct appeal. However, an exception to the forfeiture rule exists where the facts relating to the claim do not appear on the face of the original appellate record. See *People v. Williams*, 209 Ill. 2d 227, 233 (2004). Here, the record is unclear as to whether defendant was present at the first jury instructions conference. Thus, he could not have raised his claim on appeal. Under the circumstances, we shall not apply the forfeiture rule.

■ The State argues second that defendant's claim is frivolous because the trial record refutes his allegation that he was not present at the initial jury instructions conference. We disagree; the record is ambiguous. The report of proceedings of the first jury instructions conference (in contrast to that of the second conference the next day) does not state that defendant was present. Although defendant was in court shortly before the first conference, that does not establish that he was present during the conference. Moreover, we agree with defendant that Potkonjak's statement to the judge that Conway had "called [Potkonjak] over" at least suggests that defendant had not been at the conference. Hence, the record does not refute defendant's allegation that he was not present at the conference, and we must accept it as true for purposes of deciding this appeal. We also note that we may not decide the issue of whether defendant voluntarily waived his right to attend the conference, as that presents a question of fact. See *Gagnon*, 470 U.S. at 527-29, 84 L. Ed. 2d at 490-92, 105 S. Ct. at 1485.

■ Having discussed the factual premise of defendant's claim, we now turn to whether it has legal merit. Although defendant cites authority stating that a defendant has the right to be present at any

critical stage in the proceedings against him, he cites no authority that addresses the specific question of whether the jury instructions conference is such a critical stage. There is little pertinent authority in Illinois. The one opinion that we have found provides only limited guidance on the subject.

In *People v. Strohl*, 118 Ill. App. 3d 1084, 1086-87 (1983), the defendant was charged with first-degree murder. At the jury instructions conference, which the defendant did not attend, his attorney tendered an instruction on involuntary manslaughter and told the judge that, per the defendant's express wish, he would not tender an instruction on voluntary manslaughter. The judge did not give the involuntary-manslaughter instruction but did instruct the jury on self-defense. The jury convicted the defendant. In a posttrial motion, the defendant alleged that his desire not to tender an instruction on voluntary manslaughter had been conditioned on the understanding that the judge would give the instruction on involuntary manslaughter; defendant had not wanted the jury to have to choose between convicting him of murder and acquitting him altogether. *Strohl*, 118 Ill. App. 3d at 1090.

On appeal, the defendant argued that he had had the right to be present at the instructions conference and, as a consequence, the trial court had had the duty to ascertain from him personally whether he wished to waive the instruction on voluntary manslaughter. The appellate court summarily rejected these arguments with the statement, "We know of no such right or duty and know of no well-reasoned authority to support them." *Strohl*, 118 Ill. App. 3d at 1090.

We would hesitate to rely on *Strohl* alone to hold that a defendant has no right to attend a jury instructions conference. Initially, we note that the court disposed of the issue in a summary manner. It stated that it knew of no well-reasoned authority to support the defendant's position. However, the court did not cite any case law in support of its holding either. Further, *Strohl* was decided before *People v. Brocksmith*, 162 Ill. 2d 224 (1994), which held that a defendant has the personal right to decide whether to tender an instruction on a lesser included offense (*Brocksmith*, 162 Ill. 2d at 229). Although *Strohl* described the trial court's alleged duty to ask the defendant whether he wanted an instruction on the lesser included offense as "derivative" of the defendant's claimed right to attend the jury instructions conference (*Strohl*, 118 Ill. App. 3d at 1090), defendant here argues the reverse—that, because *Brocksmith* gave him the right to decide personally whether to tender a jury instruction on second-degree murder, the trial court had the duty to allow him to attend the jury instructions conference so as to protect that right. Thus, *Strohl*'s

conclusion that a defendant has no right to attend the jury instructions conference must be reevaluated in the post-*Brocksmith* context.[1]

Such a reevaluation leads us to conclude that defendant had no right to attend the jury instructions conference. Federal courts of appeal that have considered the issue appear to be unanimous in holding that there is no such right. See, *e.g.*, *United States v. Romero*, 282 F.3d 683, 690 (9th Cir. 2002); *United States v. Rivera*, 22 F.3d 430, 438-39 (2d Cir. 1994); *United States v. Gregorio*, 497 F.2d 1253, 1259-60 (4th Cir. 1974). State courts appear to concur without exception. See, *e.g.*,

---

[1]*Strohl*'s holding that a defendant has no right to have the trial court ascertain that he has voluntarily waived a jury instruction on a lesser included offense appears to be valid even in light of *People v. Medina*, 221 Ill. 2d 394, 409-10 (2006), under which such an inquiry is required only when a lesser included offense instruction *has* been tendered. However, to the extent that *Strohl* could be read to hold that no such duty of inquiry exists at all, it has been superseded by *Medina*.

We also note that *Medina* would appear to require an inquiry regarding voluntariness where—as initially happened here—a defendant tenders an instruction on an offense that, while not technically a lesser included offense, is less serious than the one charged. Defendant suggests that, had he been present at the first jury instructions conference, "he would have been admonished about the possible risks of tendering the lesser included offense jury instruction and would have been informed that the decision to tender the instruction was his to make." However, defendant overlooks that *Medina* was issued more than seven years after his trial and about six years after his conviction and sentence were affirmed on appeal. At the time of defendant's trial, the law was that no admonishments or inquiries were needed in connection with a defendant's decision to tender an instruction on a lesser included offense. See *People v. Castillo*, 298 Ill. App. 3d 839, 846 (1998). Therefore, defendant's assertion is questionable at best.

Moreover, in this postconviction proceeding, defendant would not be entitled to the benefit of *Medina*. One appellate opinion has held that *Brocksmith*'s rule is procedural and therefore does not apply retroactively in postconviction proceedings. *People v. Turner*, 337 Ill. App. 3d 80, 86 (2003). *A fortiori*, *Medina*'s rule, which establishes a procedural safeguard for the right created in *Brocksmith*, also does not apply retroactively to postconviction proceedings. Of course, as we shall note, *Turner*'s reasoning is questionable insofar as it is based on the assumption that the *Brocksmith* rule is merely a safeguard for a defendant's due process rights and has no "constitutional significance on its own." *Turner*, 337 Ill. App. 3d at 91. However, even if *Brocksmith*'s rule is constitutionally based, that would not necessarily make it applicable retroactively in a collateral proceeding.

*People v. Butler*, 46 Cal. 4th 847, 865, 209 P.3d 596, 609, 95 Cal. Rptr. 3d 376, 391-92 (2009); *State v. Swanson*, 112 Haw. 343, 354, 145 P.3d 886, 897 (2006); *Jordan v. State*, 786 So. 2d 987, 1022 (Miss. 2001); *State v. Bear Runner*, 198 Neb. 368, 371, 252 N.W.2d 638, 640 (1977); *State v. Bremer*, 98 Wash. App. 832, 834-35, 991 P.2d 118, 120 (2000).

These opinions reason that since "[t]he content of the instructions to be given to the jury is purely a legal matter" (*Rivera*, 22 F.3d at 438), it is unlikely that a defendant can contribute anything significant to the process (*Gregorio*, 497 F.2d at 1259). Further, even if the defendant does not observe the conference itself, he will be able to observe the final product of the conference—the giving of the instructions. *Gregorio*, 497 F.2d at 1259. It is certainly important for the defendant to understand the instructions. However, explaining them at the instructions conference would be disruptive and time-consuming, and "a private conference between defense counsel and the defendant would better serve the explanatory function." *Gregorio*, 497 F.2d at 1259. Thus, insofar as defendant bases his claimed right to attend the jury instructions conference on the general proposition that correct jury instructions are vital to a fair trial, his argument is contrary to the weight of case law authority throughout the country.

Defendant, of course, does not rely solely on general principles in contending that he had the right to attend the jury instructions conference. He argues that, had he attended the conference, he "could have objected when his attorney withdrew the second-degree murder instruction." We are unpersuaded by this argument. Attending the jury instructions conference was unnecessary to enable defendant to decide whether he wanted to tender the instruction on second-degree murder. The sort of private conference to which *Gregorio* refers serves the same purpose; thus, all that was required was the effective assistance of counsel. Assuming that counsel performed effectively, defendant had a full and fair opportunity to have the instructions that he desired tendered to the court. If counsel did not perform effectively, then defendant has a remedy in a postconviction claim of ineffective assistance. We will not create a general constitutional right that rests on no more than the anticipation that counsel will neglect or fail to communicate his client's wishes. To be sure, the better practice would be to allow a defendant to attend a jury instructions conference, but that does not mean that attendance at such a conference is a constitutional right.

Defendant also argues that the Illinois Constitution gave him the right to be present at the first jury instructions conference. He observes that, under the state constitution, a criminal defendant has a "broad" right to be present at every stage of his trial, so as to protect

his substantial rights to due process and to defend himself in person (Ill. Const. 1970, art. I, §§2, 8). *People v. Bean*, 137 Ill. 2d 65, 80-81 (1990). He reasons that the "broad" right encompasses the specific right to attend a jury instructions conference. What we have said about the federal constitutional right to be present at crucial stages applies to defendant's invocation of his state constitutional right. Defendant cites nothing to suggest that the state constitutional right is any broader than the federal right, and no authority so holds (*Strohl*, the only opinion that we have found, surely does not support defendant). Therefore, we find no state constitutional right to attend the jury instructions conference.

Accordingly, we hold that defendant's *pro se* postconviction petition does not state the gist of a meritorious claim insofar as it relies on a purported constitutional right to attend the first jury instructions conference. Therefore, the summary dismissal of his petition cannot be reversed on this ground.

■ We turn now to defendant's second argument on appeal: that he stated the gist of a meritorious claim that he was denied due process and the effective assistance of counsel in that his trial attorneys violated his constitutional right to decide personally whether to tender an instruction on second-degree murder. We hold that the petition states the gist of such a claim and that the trial court erred in holding otherwise.

We note first that, relying on *People v. Griffith*, 158 Ill. 2d 476, 493 (1994), the trial court held that the choice of whether to submit the instruction at issue belonged to defendant's attorneys, not defendant.[2] The court apparently overlooked *Brocksmith*, which was decided shortly after *Griffith* (and 11 years before the ruling on defendant's postconviction petition). In *Brocksmith*, the court held that deciding whether to tender an instruction on a lesser included offense is ultimately the prerogative of the defendant, not counsel. *Brocksmith*, 162 Ill. 2d at 229.

We also note, however, that there is some question whether the alleged violation of *Brocksmith* is itself a constitutional deprivation, so

---

[2]*Griffith* affirmed the murder conviction of a defendant who, after being admonished by the court that he had to decide personally whether to tender an instruction on second-degree murder, decided not to do so. The supreme court explained that, although the decision whether to tender certain instructions was not one that belonged to a defendant personally, the defendant had no ground for relief merely because he had decided a matter of trial strategy that was primarily entrusted to his attorney. The court reasoned that the defendant had made his decision voluntarily, with the advice of counsel and with full understanding of the consequences. *Griffith*, 158 Ill. 2d at 493-94.

as to come within the Act, or whether it is pertinent only to a claim that defendant was denied his (undoubtedly constitutional) right to the effective assistance of counsel. Although *Brocksmith* does not explicitly state that the right that it recognizes is of constitutional origin or dimension, it analogizes that right to the right to decide personally whether to plead guilty, which is, of course, constitutional (*Boykin v. Alabama*, 395 U.S. 238, 242, 23 L. Ed. 2d 274, 279, 89 S. Ct. 1709, 1711-12 (1969); *People v. Ortiz*, 82 F.3d 1066, 1070 (D.C. Cir. 1996)). *Brocksmith*, 162 Ill. 2d at 229. In *Medina*, the supreme court developed the analogy, observing that, by tendering an instruction on a lesser included offense, the defendant is in essence stipulating that the evidence is sufficient to convict him of an offense with which he was not charged, thus "exposing himself to potential criminal liability, which he otherwise might avoid." *Medina*, 221 Ill. 2d at 409. We do note that, in *Brocksmith*, the defendant's petition under the Act claimed that he was denied both the effective assistance of counsel and the right to decide whether to tender an instruction on a lesser included offense. *Brocksmith*, 162 Ill. 2d at 226.

Nonetheless, in *Turner*, 337 Ill. App. 3d at 91, the court held that a defendant's personal right to tender a jury instruction on a lesser included offense is a procedural safeguard and not a due process right. The court noted that *Brocksmith* did not invoke either the federal or the state constitution but relied on commentaries to American Bar Association standards that were not necessarily based on constitutional requirements. *Turner*, 337 Ill. App. 3d at 88-89; see also *Brocksmith*, 162 Ill. 2d at 228, citing 1 ABA Standards for Criminal Justice §4—5.2, Commentary, at 4—68 (2d ed. Supp. 1986). We need not decide here whether the *Brocksmith* court meant to imply that the defendant's personal right to decide whether to tender an instruction on a lesser included offense is constitutionally based; there is no doubt that the court held that the violation of that right can support a claim that the defendant's attorney was ineffective. We consider the alleged *Brocksmith* violation here in that light.

We also clarify that *Brocksmith* applies here even though, technically, second-degree murder is not a lesser included offense of first-degree murder. See 720 ILCS 5/9—2(a) (West 1998) (second-degree murder includes all elements of first-degree murder plus mitigating factor). The same considerations apply. As with an instruction on a lesser included offense, a defendant who is charged with first-degree murder and tenders an instruction on second-degree murder risks exposure to conviction of an uncharged offense and does so in the hope that, even if the jury rejects his primary theory of the case (here, self-defense), it will convict him of a less serious offense than that

charged. As with the defendant tendering an instruction on a lesser included offense, the defendant who tenders an instruction on second-degree murder has decided against an all-or-nothing strategy in favor of providing the jury with a middle way. See *People v. Walton*, 378 Ill. App. 3d 580, 587-88 (2007) (court treated defendant's assertion that he was denied right to decide personally whether to advance all-or-nothing strategy or pursue option of second-degree murder conviction as raising a *Brocksmith* claim, although court held that *Brocksmith* did not apply in bench trial).

We consider whether defendant's petition stated the gist of a claim of ineffective assistance of counsel. To do so, the petition had to allege facts to show that (1) counsel's performance was objectively unreasonable ("deficient performance" prong); and (2) it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different ("prejudice" prong). *People v. Young-blood*, 389 Ill. App. 3d 209, 214 (2009). We hold that the petition did so.

The State argues that the record refutes defendant's allegation that his attorneys did not allow him to decide ultimately whether to tender the instruction on second-degree murder. The State relies on the exchanges that we quoted in which Potkonjak told the trial judge that the decision not to tender the instruction was "[his] client's decision" and that, after being informed of his alternatives, defendant "still made the decision to go with just a self-defense [instruction]." We disagree with the State that Potkonjak's words *refute* what defendant alleged in his petition and the accompanying affidavit. The quoted excerpt simply shows Potkonjak's recollection of what happened and creates an evidentiary conflict that cannot be resolved at this juncture. Whether defendant's affidavit or Potkonjak's statement to the judge is the correct description of what happened off the record is not dispositive in deciding whether the allegations of defendant's petition, taken as true, stated the gist of a meritorious claim. We conclude that they did.

Defendant's affidavit alleged facts that, if proved, would show that his attorneys violated his established right under *Brocksmith* to decide personally whether to tender an instruction on second-degree murder—an instruction to which, all agree, he was legally entitled. According to the affidavit, Conway and Potkonjak assumed that the decision was ultimately theirs, and they acted accordingly, informing defendant after the fact of their choice. Thus, the petition satisfied the "deficient performance" prong of the test for ineffectiveness. Although the "prejudice" prong analysis is necessarily more complicated, we conclude that the petition, in light of the trial record, also stated the

gist of a reasonable probability that, had the instruction been given, the jury would have convicted defendant of second-degree murder and not first-degree murder.

To obtain a conviction of the lesser charge of second-degree murder, defendant would have had to prove by a preponderance of the evidence (see 720 ILCS 5/9—2(c) (West 1998)) that, at the time of the killing of Friar, he unreasonably believed that the circumstances were such that, had they existed, would have justified or exonerated the killing under article 7 of the Criminal Code of 1961 (720 ILCS 5/7—1 *et seq.* (West 1998)). 720 ILCS 5/9—2(a)(2) (West 1998). The evidence at trial was sufficient to create a reasonable probability that defendant would have carried this burden.

Here, the pertinent principle of justification was self-defense (720 ILCS 5/7—1 (West 1998)). The jury, of course, rejected defendant's affirmative defense that he shot Friar out of a *reasonable* belief that he needed to defend himself or another against Friar's imminent use of force (720 ILCS 5/7—1 (West 1998)). Nonetheless, there was evidence from which the jury could have found that defendant shot Friar because he *unreasonably* believed that doing so was necessary in self-defense (or, perhaps, in defense of another person on the scene).

The witnesses to the initial confrontation testified that angry words were exchanged between people who, it is plain from other testimony, belonged to rival gangs. Jones, Henley, and Parks all testified that, in the second confrontation, immediately before the shooting, Friar advanced toward defendant and directed taunts and provocations at him. Although Jones stated that Friar had his palms out, the jury could have rejected this part of his testimony, or accepted it but still have found that defendant feared imminent violence, albeit unreasonably. Wise testified that Friar was not a peaceful man but rather a high-ranking member of the Four Corner Hustlers who had shot a man at least once before. According to Kerkorian's testimony, Friar might well have wanted to inflict violent harm on the rival gang member and interloper from Chicago. According to Scheller, Henley had told the grand jury that, as Friar approached, defendant may have told him that he ''[didn't] want no trouble.'' Finally, although defendant initially told the police that he saw Parks "shoot the dude," he then stated that Friar pulled a gun and aimed it at him and that, believing that he "was going to die," he shot Friar. Defendant's account was contradicted by most of the other witnesses, who did not see Friar with a gun, but it did provide some evidence that defendant was acting out of an actual, if unreasonable, belief in the need for self-defense. Finally, the witnesses who testified to hearing numerous gunshots and seeing numerous people scattering after the shooting

provided some evidence that what happened was a gang melee conducive to a subjective, if unreasonable, belief by defendant in the need to defend himself. We conclude that, at least for the purpose of first-stage postconviction proceedings, it is arguable that there was a reasonable probability that giving the jury a second-degree murder instruction would have changed the outcome of the trial. See *People v. Hodges*, 234 Ill. 2d 1, 17 (2009) ("At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced").

To summarize, defendant's petition did not state the gist of a meritorious claim that he was denied any constitutional right to attend the first jury instructions conference, but it did state the gist of a meritorious clam that his trial attorneys were ineffective for violating his right to decide ultimately whether to tender a jury instruction on second-degree murder. Because partial dismissals are unauthorized (*People v. Rivera*, 198 Ill. 2d 364, 374 (2001)), the entire petition must be advanced to the next stage (see 725 ILCS 5/122—2.1(b) (West 2008)).

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the cause is remanded.

Reversed and remanded.

McLAREN and BURKE, JJ., concur.