**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200202-U

Order filed April 3, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Knox County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0202 Circuit No. 14-CF-288 |
| CHRISTOPHER L. CROOM, | ) ) ) | Honorable Scott Shipplett, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Trial court erred in dismissing defendant's postconviction petition at the first stage of the proceedings where the allegations in the petition presented the gist of a constitutional claim of ineffective assistance of counsel.

¶ 2     Defendant, Christopher L. Croom, appeals from the Knox County circuit court's first-stage dismissal of his *pro se* postconviction petition. He argues that the trial court erred in dismissing his petition at the first stage of the proceedings because he presented arguable claims

of ineffective assistance of trial and appellate counsel. We reverse and remand for second-stage proceedings.

¶ 3                                    I. BACKGROUND

¶ 4         On September 12, 2014, defendant was charged by grand jury indictment with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2014)) and one count of unlawful possession of a weapon (a knife) by a felon (*id.* § 24-1.1(a)). Counts 1 through 4 alleged that on August 13, 2014, defendant, without lawful justification, stabbed Melvin Bucker in the chest, thereby causing his death. Count 5 alleged that defendant, as a person convicted of a felony, knowingly and unlawfully possessed a knife during the commission of the offense.

¶ 5         On October 28, 2014, forensic psychologist Dr. Robert Meyer conducted a psychological evaluation of defendant pursuant to court order. During the evaluation, defendant described the fight that occurred that evening and the circumstances leading up to the stabbing incident. He then told Dr. Meyer, "There has to be something wrong with me. I was out of federal prison for only two weeks when this occurred." Defendant explained that he recently served a seven-year sentence in a maximum security prison where he witnessed stabbings almost daily. He noted that "after a while with all the blood and stabbing and violence you become somewhat numb to it." While he was in federal prison, defendant suffered life-threatening injuries from a fight that required hospitalization. When he came out of prison, his near-death experience changed him. "I just began telling myself I cannot lose. I just felt like if anybody disrespected me or approached me, I had to walk away. I did not want to be like some of the dudes that I have seen killed." He described himself as "hyper vigilant, always on the lookout for being assaulted, always on guard," and stated that he carries a knife to protect himself.

2

¶ 6     Dr. Meyer's overall diagnostic impression of defendant was that he displayed symptoms of posttraumatic stress disorder (PTSD). He opined that defendant would likely benefit from psychotherapy "to address his past trauma and current difficulties in regulating his emotions." In an answer to discovery filed on March 25, 2015, defendant stated that he intended to call Dr. Meyer as a witness at trial and attached his evaluation report.

¶ 7     In August 2015, defense counsel requested Dr. Terry M. Killian's services. Dr. Killian evaluated defendant on August 25, 2015, and noted that defendant had "fairly clear symptoms of PTSD." Defense counsel did not provide Dr. Killian's report to the prosecution in discovery, as counsel elected not to call him as an expert witness.

¶ 8     On October 5, 2015, the State notified defendant of its intent to seek a 15-year sentencing enhancement on the basis that defendant was also armed with a firearm during the commission of the offense (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)). At a hearing that same day, prosecutors from the Attorney General's Office appeared as co-counsel with the Knox County State's Attorney.

¶ 9     At a pre-trial hearing on February 24, 2016, defense counsel informed the court that it did not intend to call Dr. Meyer or Dr. Killian as a psychological expert at trial. The State acknowledged that it had received a written "Statement of Intent," indicating that the defense did not intend to call either witness. Defendant was present at the hearing and did not object. Defendant also filed a motion *in limine* seeking to admit Buckner's prior convictions. The motion alleged that Buckner had been convicted of domestic battery in 2007 and violating an order of protection in 2008. Defendant claimed that both convictions were probative of Buckner's reputation for violence and the circumstances surrounding the August 13, 2014, incident. The trial court denied defendant's request to introduce evidence of Buckner's order of

3

protection violation but ruled that his domestic battery conviction could be introduced as evidence to determine whether he was the initial aggressor.

¶ 10       A jury trial commenced on April 19, 2016. LaToya Wright (Buckner's friend), Rashonda Starnes (Buckner's cousin), and Jessica Anthony (Buckner's sister) testified that they gathered at a party in the front yard of an abandoned house on West Brooks Street in Galesburg on the night of August 13, 2014. Defendant, Buckner, and several others were also present. Everyone was drinking. A disagreement broke out among the men, and, in the commotion, defendant and Buckner pushed each other and started fighting. Wright heard the commotion and pulled Buckner away, telling him "we're not doing this tonight." Buckner responded, "he's GD. I'm BD," which Wright testified was a gang reference. Defendant and Buckner walked down the street in opposite directions to cool down. About 10 to 15 minutes later, after the fight subsided, defendant approached Buckner again. All three women testified that, as defendant offered his hand in an apparent gesture of peace, Buckner extended his hand without making any threats and defendant struck him on the left side of his chest. Buckner reacted by swinging at defendant, and defendant struck Buckner again. As defendant pulled away, Buckner began bleeding from his chest and said, "I think I've been stabbed."

¶ 11       Wright, Starnes, and Anthony chased after defendant. As he ran down the street, defendant turned and threatened to kill them. Wright and Starnes testified that they witnessed defendant with a gun. Starnes said she chased defendant down with a bat and saw him make a motion toward his waistband but did not see him actually draw the gun. Wright testified that defendant pulled a gun from the front of his pants and said, "I'm gonna blow all you bitches away."

¶ 12    Defendant's theory at trial was that Buckner was the initial aggressor. Defense witness Christopher Rasso testified that Buckner was aggressive toward defendant earlier in the evening and was the instigator of the first altercation. Rasso stated that Buckner was talking "gangbanging stuff" and that defendant was "more calm." Rasso testified that he went back to his house after the initial fight and did not see the fatal exchange.

¶ 13    Jovan Cook and Isidro Hernandez also testified for the defense. They attended the gathering with defendant and claimed that Bucker approached defendant earlier that night, but they admitted they were not around during the second fight when defendant stabbed Buckner.

¶ 14    Defendant testified that during the initial confrontation Buckner was repeatedly pushing him and saying, "I'm BD Melvo. What's up?" He explained that Buckner was "coming at him" and that he did not know where Buckner's aggression was coming from. When they walked away, defendant was ready to leave, but Buckner still looked upset. Just before the second altercation, Buckner had a bag under his arm that he did not have before. Defendant believed he had a gun inside the bag. Buckner approached defendant as if he was "up to something" and made a threatening motion in defendant's direction. Defendant put his hand up, as if to indicate not to come any closer, and Buckner swung at him. Defendant swung back with a knife, striking Buckner near the collarbone. After defendant exchanged multiple punches with Buckner, the crowd chased after him, and he left.

¶ 15    Defendant denied having a gun that night. He testified that Buckner was the one who attacked him and that he was only defending himself when he stabbed Buckner with the knife. Defendant explained that Buckner seemed "bristled up about the situation" and in his community "you have to adapt to kind of be able to read people's body language." He did not believe Buckner's wounds were severe. He thought he stabbed Buckner in the shoulder, not the chest. At

5

the end of defendant's testimony, the defense rested. Counsel did not seek to admit Buckner's domestic battery conviction.

¶ 16    United States Marshals and county deputies apprehended defendant a few weeks later at his father's house in McHenry County. Officers recovered a handgun and defendant's wallet from a pair of jeans found inside the house. The handgun was admitted into evidence.

¶ 17    The trial court instructed the jury on self-defense (justified use of force) and second degree murder (provocation and unreasonable belief). On self-defense, the jury was instructed that "[a] person is justified in the use of force when and to the extent he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force." On second degree murder, the court informed the jury that "[a] mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable" or "if at the time of the killing the defendant acts under a sudden and intense passion resulting from serious provocation by Melvin Buckner." The jury was also asked to determine whether the State had proven beyond a reasonable doubt that defendant possessed a gun at the time of the stabbing.

¶ 18    During deliberations, the jury sent the following note:

"If we find defendant guilty of 1st [degree] murder, probably knew actions would cause bodily harm or death unanimous – in addressing 2nd degree charge, do we all need to agree that mitigating circumstances was [*sic*] present? Do we all need to agree a mitigating circumstance was not present?"

The trial court responded that the verdict must be unanimous.

6

¶ 19        The jury found defendant guilty of first degree murder and unlawful possession of a weapon by a felon and concluded that the State failed to prove the firearm enhancement.[1] Following a sentencing hearing, the trial court sentenced defendant to 55 years in prison.

¶ 20        On direct appeal, defendant argued that he did not knowingly waive his right to conflict-free counsel and the trial court erred in failing to conduct an evidentiary hearing regarding jury impartiality. We affirmed defendant's conviction and sentence. See *People v. Croom*, 2019 IL App (3d) 160553-U.

¶ 21        On March 27, 2020, defendant filed this postconviction petition as a self-represented litigant, alleging, among other things, that trial counsel and appellate counsel were ineffective for (1) failing to use Dr. Killian and Dr. Meyer as expert witnesses and present their reports revealing his PTSD diagnosis at trial, (2) refusing to use Buckner's criminal history as impeachment evidence, and (3) allowing the handgun to be admitted over the "deliberate and deceptive" actions of the prosecutors.

¶ 22        Defendant attached several documents to the petition, including a psychological report completed by Dr. Killian dated September 28, 2015. Dr. Killian's report noted that defendant had been referred to him by defense counsel "for the purpose of giving opinions regarding [defendant's] mental state at the time of the alleged murder." He conducted a lengthy interview with defendant and reviewed numerous documents, including two psychological reports written by Dr. Meyer. Based on his own psychological evaluation of defendant, Dr. Killian agreed with Dr. Meyer's diagnosis that defendant suffered from PTSD:

---

[1]The order entered on direct appeal incorrectly states that the jury found defendant not guilty of the murder charge involving a firearm and not guilty of the charge of unlawful possession of a weapon by a felon. See *People v. Croom*, 2019 IL App (3d) 160553-U, ¶ 12. Defendant was found guilty of two counts of first degree murder for stabbing Buckner with a knife, and the jury found him guilty of unlawful possession of a weapon (a knife) by a felon.

"While I do not see any significant evidence to suggest that [defendant] was psychiatrically unable to appreciate the criminality of his alleged conduct, there certainly does appear to be some possible psychiatric mitigation in that defendant's life experiences since his early childhood and continuing in federal prison have included witnessing and experiencing extensive violence, which has led him to develop fairly clear symptoms of PTSD, including marked hypervigilance and a deep-seated belief that one has to constantly stand up for oneself for fear that others would see weakness and then attack."

Dr. Killian explained that defendant's life experiences, starting early in his childhood and continuing in federal prison, caused him to feel "a constant need to protect oneself at all cost [*sic*] in order to avoid being killed by violent persons nearby." He concluded, within a reasonable degree of psychiatric certainty, that "[defendant] has PTSD as a result of the extensive violence he has witnessed and experienced" and that his PTSD diagnosis "should be taken into consideration in this case and may provide some psychiatric mitigation."

¶ 23    The trial court found defendant's ineffective assistance of counsel claims to be frivolous and patently without merit and dismissed the petition at the first stage of the proceedings. Defendant appeals.

¶ 24                              II. ANALYSIS

¶ 25    Defendant argues that the trial court erred in dismissing his petition at the initial stage of the postconviction proceedings because it presented the gist of a constitutional claim for ineffective assistance of trial and appellate counsel. Our review of a summary dismissal of a postconviction petition is *de novo. People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

8

¶ 26　　　　　The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a mechanism by which a criminal defendant can assert that his conviction resulted from a substantial denial of his rights under the federal and state constitutions. 725 ILCS 5/122-1(a) (West 2020). A postconviction proceeding is not an appeal from the judgment of conviction; it is a collateral attack on the trial court proceedings. *People v. Petrenko,* 237 Ill. 2d 490, 499 (2010). To be entitled to postconviction relief, a defendant must establish that a substantial deprivation of constitutional rights occurred in the trial proceedings. *People v. Harris,* 206 Ill.2d 1, 12 (2002).

¶ 27　　　　　There are three stages of a postconviction proceeding. 725 ILCS 5/122-1(a)(1) (West 2020). At the first stage, the circuit court must review the defendant's petition within 90 days of it being filed and may dismiss the petition if it is frivolous or patently without merit. *Id.* § 122-2.1(a)(2). If the petition is not dismissed at the first stage, it advances to the second stage, where counsel is appointed to represent the petitioner. *Id.* § 122-4. If the petition is not dismissed at the second stage, it advances to a third-stage evidentiary hearing. *Id.* § 122-6.

¶ 28　　　　　At the first stage of the proceedings, the defendant need only state the "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. The first-stage threshold is low, requiring only that the petitioner "plead specific facts to assert an *arguable* constitutional claim." (Emphasis added.) *People v Brown*, 236 Ill. 2d 175, 184 (2010). The trial court may summarily dismiss a petition only if it is frivolous or patently without merit; that is "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. At the first stage, a limited amount of detail will suffice, and the petitioner is not required to include legal argument or citation to legal authority. *Id.* Courts are admonished to review first-stage *pro se* petitions with leniency, "allowing borderline cases to proceed." *Id.* at 21.

9

¶ 29        In his petition, defendant alleged, among other things, that trial counsel was ineffective for failing to call Dr. Killian and Dr. Meyer as psychological experts at trial and that appellate counsel was ineffective for failing to raise the issue on direct appeal. Trial counsel provides ineffective assistance if (i) his or her performance falls below an objective standard of reasonableness, and (ii) there is a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The standard for ineffective assistance of appellate counsel is similar. A defendant must show that appellate counsel's performance was unreasonable, and it resulted in prejudice, i.e., "there is a reasonable probability that, but for appellate counsel's error, the appeal would have been successful." *People v. Golden*, 229 Ill. 2d 277, 283 (2008).

¶ 30        At the first stage of postconviction proceedings in which a defendant alleges ineffective assistance of counsel, the issue is not whether the defendant has actually proven ineffectiveness under *Strickland*; the issue is whether, taking the allegations contained in the petition as true, the defendant has stated the gist of a claim such that the petition is not frivolous. *People v. Edwards*, 197 Ill. 2d 239, 246-47 (2001). In other words, a petition alleging ineffective assistance of counsel may not be dismissed at the first stage of postconviction proceedings if "(i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphasis added.) *Hodges*, 234 Ill. 2d at 17.

¶ 31        Here, defendant's petition made an arguable showing the trial counsel's performance was deficient. Both doctors conducted psychiatric evaluations of defendant prior to trial and diagnosed defendant with PTSD, and defense counsel had access to those reports. The record indicates that Dr. Meyer's report was attached to discovery filed by defense counsel in March 2015, and he requested Dr. Killian's services in August 2015. Presumably, counsel was well

10

aware of the contents of those psychiatric reports and the PTSD diagnosis as of August 2015, at the latest.

¶ 32    At trial, more than a year later, defendant testified that he believed he needed to defend himself. Although other occurrences witnesses testified on behalf of defendant, none of them witnessed the second altercation in which defendant stabbed Buckner. Given the experts' assessments of defendant's mental state at the time of incident—assessments that counsel possessed well in advance of trial—counsel arguably should have presented the expert witnesses at trial and used their reports diagnosing defendant with PTSD as evidence in support of defendant's claims. See *People v. Whiters*, 146 Ill. 2d 437, 444 (1992) ("Perception of danger is always material and relevant to defendant's belief that the use of deadly force is justified.") As it stood, defendant's testimony that he believed he needed to defend himself against Buckner's aggressive, gang-affiliated actions was an uncorroborated defense theory. Had Dr. Killian and Dr. Meyer testified at trial, their conclusions that defendant's PTSD symptoms included hypervigilance and a strong belief that he "constantly had to stand up for himself" may have bolstered defendant's testimony that he believed, albeit unreasonably, that the circumstances required him to defend himself when Buckner approached him. See 720 ILCS 5/9-2(a)(2) (West 2014) (second degree murder requires proof of mitigating factor that defendant "believes the circumstances to be such that, if they existed, would justify or exonerate the killing[,]" but defendant's belief is unreasonable). Thus, it is at least arguable that trial counsel's failure to utilize the reports and present both experts, or even one expert, at trial fell below an objective standard of reasonableness. See *People v. Irvine*, 379 Ill. App. 3d 116, 130 (2008) (defense counsel cannot be found to have made decision based on sound trial strategy where he fails to conduct a reasonable investigation and call appropriate witnesses); *People v. Makiel*, 358 Ill.

11

App. 3d 102, 106 (2005) ("Failure to subpoena witnesses known to defense counsel who contradict the State's case or provide exonerating testimony demonstrates ineffective assistance of counsel.").

¶ 33    It is also arguable that counsel's deficient performance resulted in prejudice to defendant. At trial, defense counsel presented two theories of defense. Primarily, counsel argued that defendant stabbed Buckner in self-defense, reasonably believing that his life was in danger, and therefore should be acquitted of first degree murder. In the alternative, counsel argued that if defendant's belief that his life was in danger was unreasonable or if he was acting under intense passion resulting from serious provocation by Buckner, the verdict should be second degree murder. In response to the parties' requests, the trial court tendered instructions for both self-defense and second degree murder to the jury. The success of either defense theory ultimately hinged on counsel's ability to show the jury that defendant believed, reasonably or unreasonably, that he was in danger and force was necessary when he stabbed Buckner. See *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 32 (affirmative defense of self-defense can only be raised if defendant presents, among other things, some evidence that defendant "actually believed that a danger existed" and that the force used was necessary to avoid the danger); *People v. DuPree*, 397 Ill. App. 3d 719, 736-37 (2010) (finding a reasonable probability of second degree murder verdict where evidence supported defendant's subjective, if unreasonable, belief in the need to defend himself). In this case, the experts' evaluations and opinions would have offered insight into both theories at trial.

¶ 34    Proof of self-defense aside, it is at least arguable that evidence of defendant's PTSD diagnosis would have been relevant in proving the lesser mitigated offense of second degree murder alone. See *People v. Jeffries* , 164 Ill. 2d 104, 122 (1995) (second degree murder is a

12

lesser mitigated offense of first degree because it is first degree murder *plus* defendant's proof by a preponderance of the evidence that a mitigating factor is present). As noted, the psychological reports plainly state that defendant was suffering from PTSD at the time of the altercation with Buckner. In fact, Dr. Killian's report specifically explains that there was "psychiatric mitigation" regarding Buckner's stabbing due to defendant's PTSD symptoms. If Dr. Killian and Dr. Meyer had been called as witnesses at trial, their testimony and reports could have provided an explanation of defendant's PTSD diagnosis and the symptoms he likely experienced that contributed to his perception of danger. Such evidence would have supported the defense's second-degree murder theory that defendant believed, unreasonably, that he needed to defend himself when Buckner approached the second time. Moreover, it is apparent that expert testimony regarding defendant's unreasonable perception of the circumstances as it relates to psychological mitigation would have been helpful during deliberations given the jury's note, which suggests that members struggled with mitigating circumstances and the second degree murder instruction. We therefore conclude that, at least for the purpose of first-stage proceedings, it is arguable that there was a reasonable probability that calling Dr. Killian and Dr. Meyer as witnesses would have changed the jury's verdict.

¶ 35 The State claims that the doctrine of invited error bars defendant's ineffective assistance claim because defendant agreed with defense counsel's strategy to refrain from calling both doctors as expert witnesses. We find the State's attempt to invoke the doctrine misconstrues its purpose.

¶ 36 Under the doctrine of invited error, a defendant may not request to proceed in one manner at trial and then on appeal contend that the requested course of action was in error. *People v. Denson*, 2014 IL 116231, ¶ 17. "The purpose of the invited error doctrine is to prevent a

13

defendant from unfairly receiving a second trial based on an error which he injected into the proceedings." *People v. Smith*, 406 Ill. App. 3d 879, 886-87. To allow a defendant to procure, invite, or acquiesce in a ruling by the trial court, even if it is improper, and then contest that same ruling on appeal would offend notions of fair play and encourage duplicity by litigants. *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 99. Thus, reviewing courts generally refuse to consider claims of trial court error as a result of motions brought by defense counsel or rulings issued at a defendant's request. See *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 210 (invited error applied where trial court granted defendant's motion regarding severance); *People v. Davis*, 319 Ill. App. 3d 572, 574-75 (2001) (reviewing court rejected defendant's claim that use of impeachment evidence was error where defendant requested its use at trial).

¶ 37        However, invited error does not preclude a defendant from raising a claim of counsel's neglect on the same issue. See *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001) (addressing claim of ineffective assistance in submitting verdict forms even though invited error doctrine precluded challenging forms themselves); *People v. Holliday*, 2020 IL App (5th) 160547, ¶¶ 45-51 (finding invited error applied where defense counsel stipulated to the admission of photographs yet addressing defendant's argument that counsel was ineffective for doing so); *Henderson*, 2016 IL App (1st) 142259, ¶¶ 210-14 (dismissing claim that defendant was denied a fair trial by being tried jointly with codefendant as invited error but addressing defendant's claim that counsel was ineffective for failing to object); *People v. Wood*, 2014 IL App (1st) 121408, ¶¶ 58-59 (refusing to apply invited error doctrine to ineffectiveness claim based on defense counsel's decision to pursue a trial theory that was against defendant's wishes). As the court in *Henderson* held, "the doctrine of invited error blocks defendant from raising the issue on appeal, *absent ineffective assistance of counsel*." (Emphasis added.) *Henderson*, 2016 IL App (1st) 142259, ¶ 210; see also

*People v. Lemke*, 349 Ill. App. 3d 391, 401 (2004) (holding that it was "not a case of invited error" where defendant invoked the exception to the doctrine by claiming that counsel was ineffective for failing to present involuntary manslaughter defense and there was no indication defendant requested defense not be presented). In this case, defendant claims trial counsel was ineffective for failing to call Dr. Killian and Dr. Meyer as expert witnesses and there is no indication in the record that defendant requested that the witnesses not be called or agreed with defense counsel's decision to refrain from calling them at trial. Accordingly, defendant's ineffective assistance claim is not barred by the invited error doctrine.

¶ 38 The threshold at the first stage in a postconviction proceeding is low. We find that defendant's petition meets that bar and presents an arguable claim of ineffective assistance of counsel. Because defendant's first claim warrants further proceedings, we need not address his remaining postconviction claims, as partial dismissals at the first stage are not permitted under the Act. See 725 ILCS 5/122-2.1 (West 2020); *People v. Rivera*, 198 Ill. 2d 364, 374 (2001); .

¶ 39 III. CONCLUSION

¶ 40 The judgment of the circuit court of Knox County is reversed and remanded for second-stage postconviction proceedings.

¶ 41 Reversed and remanded with directions.