THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE CASTILLO, Defendant-Appellant.

First District (5th Division)    No. 1—97—0495

Opinion filed July 24, 1998.—Rehearing denied August 21, 1998.

Michael J. Pelletier and Amy L. Yindrick, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Lisette C. Mojica, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Defendant, Jose Castillo, was charged by information with two counts of murder and one count of armed violence (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2), 33A—2) for the death of David Flores, which occurred on May 11, 1986. Defendant fled Illinois and was extradited from Texas in 1995. Following a jury trial, defendant was convicted of murder. The court sentenced defendant to 27 years' imprisonment, with credit for 430 days served and the sentence to run concurrently with a nine-year sentence for violation of bail bond on the murder charge. Defendant filed a late notice of appeal, which was allowed by the appellate court. On appeal, defendant asserts two trial errors: (1) the circuit court erred by refusing to provide an involuntary manslaughter instruction to the jury; and (2) the court erred in its determination that defendant knowingly waived his right to submit a voluntary manslaughter instruction given defendant's language barrier. For the following reasons, we affirm.

The trial began September 11, 1996. After opening arguments, the State and the defense entered stipulations regarding pathology and forensic evidence. The parties stipulated that David Flores' death was

caused by a gunshot wound to the chest and there was no evidence of close-range firing of the gun.

The State then called three eyewitnesses. Betty Lou Watts, then known as Betty Helmar (Watts), testified that on May 10, 1986, she went to Jose's Bar, located in Chicago Heights, Illinois, to meet David Flores. Around one o'clock that next morning, a man, whom Watts identified in court as defendant, approached Flores. The two men began arguing in Spanish and ended up in a scuffle. After others broke up the fight, the bar owner asked defendant to leave the bar.

Soon thereafter, Watts and Flores prepared to leave the bar. When they got outside, Flores told Watts to go home with some friends. Flores then went to the parking lot because defendant had called him out there. According to Watts, the two again started scuffling and wrestling on the ground. While they were wrestling, Watts turned her head to speak to someone. Watts next heard a gunshot and, when she turned back around, Watts saw Flores on the ground and defendant, at least 10 feet away, pointing the gun at Flores. Defendant then shot a second time. Watts ran over to shield Flores and told defendant not to shoot Flores anymore. Defendant dropped his hand down and ran toward the alley.

The State then called Augustine Falcon, who was 16 years old at the time and a member of the band playing at Jose's Bar that evening. In the early morning hours of May 11, 1986, Falcon observed an argument between defendant and Flores in which the two were yelling and pushing each other. After the fight was broken up, Falcon saw defendant walk outside. After one minute passed, defendant returned to the bar and said to Flores in Spanish, "[L]et's settle this." Flores responded, "[L]et's go." Defendant walked out the door and Flores followed.

Falcon, along with other bar patrons, walked outside and observed defendant with his arm out and a gun in his hand. Flores was standing, with his arms to his side, about 10 to 15 feet in front of defendant. Falcon then saw defendant shoot Flores twice, one shot right after the other. After the two shots were fired, Flores fell and Watts ran over and covered Flores with her body. Falcon then saw defendant run toward the alley, and Falcon ran back into the bar to see if anyone had called the police. Falcon further testified that he had seen Flores and defendant at parties and drinking together numerous times.

Joy Franklin, a bartender at Jose's Bar, corroborated the fight in the bar between defendant and Flores. Franklin testified that, after the fight was broken up, defendant left the bar but returned a minute or two later and waved someone outside. Franklin did not go outside and the next thing she knew she heard two gunshots, one right after

the other. Franklin prepared to leave with her friend and defendant's cousin, Julianna Castillo, when Falcon came into the bar and said someone had been shot.

The two women went to Franklin's car. As they were driving past the alley, Franklin heard a whistle. Franklin recognized Nowie Torrez and defendant coming from the alley and the two men ran and got into Franklin's car. Franklin testified that, when defendant got into the backseat, she saw a gun in the waist part of his pants. Defendant told Franklin to take him to Chicago and she responded that she would take defendant to his brother's. Shortly thereafter, they were stopped by the police. The State then rested its case in chief.

Defense counsel called two investigators who testified to prior inconsistent statements by Augustine Falcon and Betty Watts. Defendant then testified on his own behalf. On the night of May 11, 1986, defendant went with his friend, nicknamed "El Machine," to Jose's Bar. Defendant was having a beer at the bar when Flores approached and said he wanted to fight defendant. Defendant had seen Flores before but was not acquainted with him, and the two had never had a drink together. Defendant smelled alcohol on Flores' breath. When defendant told Flores that he must have mistaken defendant for someone else, Flores hit defendant in the shoulder. Defendant did not hit back but simply left the bar.

As defendant was going to his car, Flores "got to [defendant]" in the parking lot and pushed defendant's shoulder again. The men again started to struggle when defendant noticed Flores had a small gun. Defendant then testified as follows:

"Q. What did you do when he pointed [the gun] at you?

A. I grabbed his hand.

Q. When you grabbed his hand, what happened then?

A. One shot fired.

Q. Who fired that shot, you or the other man?

A. The guy with the gun in his hand.

Q. What happened after he fired the shot?

A. I grabbed the hand like this (indicating) and I took the gun away from him.

Q. Did you actually take the gun from him? Did you disarm him?

A. Yes.

Q. What happened after you disarmed the man that took the shot at you?

A. He grabbed my hand and he pulled it and another shot fired.

Q. Now, when he pulled your hand, did you ever try to pull your hand away from him?

A. No."

Flores ripped defendant's shirt and then fell to the ground.

Defense counsel introduced defendant's ripped shirt into evidence and defendant demonstrated the struggle for the jury. Defendant testified that he neither aimed the gun at Flores nor intentionally pulled the trigger to shoot him. After Flores fell, defendant stood surprised for a moment. Then defendant walked away with the gun still in hand. Defendant kept the gun because he was afraid the patrons who had exited the bar might shoot him if he left the gun behind.

Defendant did not return to his car because he was stunned and scared. Instead, defendant got into Joy Franklin's car. Franklin, defendant's sister-in-law, and two men were already in the car. After driving a few blocks, they were stopped by the police. When the passengers were exiting the car, the gun fell and fired. On cross-examination, defendant explained that his hand was two arms' lengths away from Flores' chest when the gun went off. Defendant also explained that, in the car, he had given the gun to one of the other men. There were final stipulations regarding two bulletholes found in doors of the transmission shop next to Jose's Bar and that the bullet found in the transmission shop was fired from the same gun that fired the bullet found in David Flores. The defense then rested. After closing arguments and deliberations, the jury returned a guilty verdict for murder. The court sentenced defendant to 27 years' imprisonment.

■ On appeal, defendant first argues that the court's refusal to give defendant's tendered jury instruction on involuntary manslaughter deprived defendant of a fair trial. The State counters that defendant has waived review of this issue by failing to include it in his posttrial motion. We agree with defendant, however, that substantial defects in jury instructions are not waived for purposes of appeal by the failure to make timely objections if the interests of justice so require. 134 Ill. 2d R. 451(c); *People v. Redd*, 173 Ill. 2d 1, 41-42, 670 N.E.2d 583, 602 (1996). Thus, we review defendant's claim that the circuit court erred by failing to instruct the jury on defendant's tendered involuntary manslaughter instruction.

■ ■ The decision to give a specific jury instruction lies within the province of the circuit court and that decision will not be reversed absent an abuse of discretion. *People v. Garcia*, 165 Ill. 2d 409, 432, 651 N.E.2d 100, 111 (1995); *People v. Kidd*, 295 Ill. App. 3d 160, 167, 692 N.E.2d 455, 460 (1998); *People v. Austin*, 133 Ill. 2d 118, 124, 549 N.E.2d 331, 333-34 (1989) (voluntary manslaughter instruction within discretion of the trial court). An involuntary manslaughter instruction should be given when there is some credible evidence in the record that would reduce the crime of first-degree murder to involuntary manslaughter. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). "Where some evidence supports the instruction, the circuit

court's failure to give the instruction constitutes an abuse of discretion." *DiVincenzo*, 183 Ill. 2d at 249, citing *People v. Jones*, 175 Ill. 2d 126, 132, 676 N.E.2d 646, 649 (1997).

■ Whether an involuntary manslaughter instruction is warranted in any given case turns on the particular facts and circumstances. Involuntary manslaughter requires a less culpable mental state than first-degree murder. *DiVincenzo*, 183 Ill. 2d at 249. Under the relevant provisions of the Illinois Criminal Code of 1961, as they existed in 1983, murder required proof that defendant intended to kill or do great bodily harm, or knew that such acts created a strong probability of death or great bodily harm. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2). In contrast, involuntary manslaughter required proof that defendant's actions, though not intended to kill an individual, were nevertheless likely to cause death or great bodily harm to some individual and were performed recklessly. Ill. Rev. Stat. 1983, ch. 38, par. 9—3(a).

According to defendant's account, Flores drew a gun and pointed it at defendant. Defendant grabbed Flores' hand and one shot went off. Defendant then wrested the gun away from Flores. Flores then grabbed defendant's hand and a second shot fired. During the instructions conference, defense counsel posited that defendant's act of grabbing the loaded gun could be construed as reckless and thereby warranted an involuntary manslaughter instruction. The State objected, arguing that, if the defendant's testimony were to be believed, his actions would constitute self-defense or an accidental occurrence, neither of which would warrant a recklessness instruction. Agreeing with the State, the court determined that, if the jury believed the defendant's version, he would be found not guilty. The court decided there was no reckless act and the evidence did not support an involuntary manslaughter instruction.

On appeal, defendant concedes that his defense at trial was one of self-defense. Nevertheless, both trial and appellate counsel have attempted to define various acts by the defendant as reckless. While trial counsel argued that defendant's grabbing of the loaded gun constituted the reckless act, on appeal appellate counsel modified defendant's position to suggest during oral argument that defendant acted recklessly when he obtained the gun and continued to struggle with Flores over the loaded gun.

■ Even construing defendant's version of the events in the light most favorable to defendant, we agree with the circuit court's determination that defendant's acts cannot be construed as even slight evidence of recklessness. Factually, this case is distinguishable from other cases in which the defendant was entitled to a recklessness instruction

when *defendant* introduced a gun into the argument, pointed the loaded gun at another, and then the gun was discharged after a struggle. *People v. Roberts*, 265 Ill. App. 3d 400, 403, 638 N.E.2d 359, 361 (1994) (defendant drew a gun from jacket pocket and victim was shot during the ensuing struggle); *People v. Austin*, 207 Ill. App. 3d 896, 898, 566 N.E.2d 492, 493 (1990) (on remand, defendant entitled to involuntary manslaughter instruction when gun she drew and held on bus driver fired and killed bus driver during struggle); *People v. Consago*, 170 Ill. App. 3d 982, 986, 524 N.E.2d 989, 992 (1988) (defendant drew a gun from desk drawer and victim killed by bullet as she reached for the gun); *People v. Sibley*, 101 Ill. App. 3d 953, 956, 428 N.E.2d 1143, 1145 (1981) (defendant, who had drawn gun and held it on father, shot boy when struggling with boy's father). In those cases, defendant was entitled to an involuntary manslaughter instruction because defendant's actions as the initial aggressor could be construed as reckless.

Here, the trial court properly refused to give an involuntary manslaughter instruction to the jury as the facts did not support a conclusion of reckless conduct by the defendant. According to defendant's version, Flores was the initial aggressor in both the bar and parking lot encounters. In the parking lot encounter, defendant intentionally obtained the gun in an attempt to protect himself. Moreover, defendant's continued struggle over the loaded gun merely continued defendant's intentional defense of self. The court correctly determined that defendant's version supported either a murder conviction or a finding of not guilty.

The second and final issue on appeal is whether the circuit court properly determined that defendant, given his language barrier, knowingly waived his right to submit a voluntary manslaughter instruction. Again, the State argues defendant waived review of this issue because it was not included in defendant's posttrial motion. And again, defendant requests plain-error review of the instruction issue. 134 Ill. 2d R. 451(c); *People v. Redd*, 173 Ill. 2d 1, 41-42, 670 N.E.2d 583, 602 (1996).

■ We begin by noting the distinction between waiver of a defendant's right and defendant's exercise of his decision not to pursue an available trial "strategy." Certain trial decisions belong solely to defendants, among them, whether to appeal, what plea to enter, whether to waive a jury trial, and whether to testify. *People v. Brocksmith*, 162 Ill. 2d 224, 227, 642 N.E.2d 1230, 1232 (1994), citing *People v. Ramey*, 152 Ill. 2d 41, 54, 604 N.E.2d 275, 281 (1992). The decision to tender an instruction on a lesser-included offense also belongs to defendant rather than to defense counsel. *Brocksmith*, 162 Ill. 2d at 229, 642 N.E.2d at 1232. Not all such trial decisions are treated equally, however.

In *People v. Smith*, 176 Ill. 2d 217, 234-35, 680 N.E.2d 291, 303 (1997), our supreme court explained that, while the trial court may be required by rule or statute to advise defendants of certain rights or to document an on-the-record waiver of those rights, other trial decisions by defendants do not require such scrutiny. In particular, while valid jury waivers and voluntary guilty pleas require certain court admonishments, the *Smith* court determined that a defendant's decision on whether to testify does not require the circuit court's scrutiny. *Smith*, 176 Ill. 2d at 234, 680 N.E.2d at 302-03, citing 725 ILCS 5/103—6 (jury waiver), 113—4(c) (voluntary guilty plea) (West 1994). Thus, the circuit court "is not required to advise a defendant of his right to testify, to inquire whether he knowingly and intelligently waived that right, or to set of record defendant's decision on this matter." *Smith*, 176 Ill. 2d at 235, 680 N.E.2d at 303.

We find the reasoning of *Smith* equally applicable to a defendant's decision regarding whether to submit an instruction on a lesser-included offense to the jury. See *People v. Gramc*, 271 Ill. App. 3d 282, 289-90, 647 N.E.2d 1052, 1057 (1995). Consequently, we find that the circuit court is not required to advise a defendant of the right to make that decision, to inquire whether the defendant knowingly and intelligently waived that decision, or to set of record the defendant's decision on the matter. See *Smith*, 176 Ill. 2d at 235, 680 N.E.2d at 303.

■ In this case, however, the circuit court endeavored to set of record defendant's decision to forego a voluntary manslaughter instruction. Thus, we have been asked to review the court's determination of whether defendant exercised that decision in an informed manner. In conducting that review, we find that defendant's asserted confusion regarding the voluntary manslaughter instruction is belied by the full record, which demonstrates the court's thorough examination of defendant's decision to forego the voluntary manslaughter instruction.

Before the defense rested, the court outlined to the parties the status of the case and acknowledged the defense strategy of not requesting a voluntary manslaughter instruction. The court then confirmed that intended strategy with defense counsel. Defense counsel indicated he had spoken with both defendant and defendant's wife regarding whether to tender the voluntary manslaughter instruction. The court then questioned defendant as to whether he had discussed the instruction with his attorney and defendant indicated he had. The court then reviewed at length the available sentencing options for voluntary manslaughter versus first-degree murder. Afterward, the record then indicates a three-page colloquy between the court and defendant regarding the voluntary manslaughter instruction. Although defendant is correct that he exhibited some confusion,

that confusion seemed to concern the logistics of the court instructing the jury on both murder and voluntary manslaughter. After repeating the question and explaining defendant's choice several times, the court determined that defendant understood the all-or-nothing strategy and had exercised his decision to pursue that line of defense. Upon review of the full record, we find that the circuit court properly determined that defendant knowingly exercised his decision to forego a voluntary manslaughter instruction.

In conclusion, we find no error in the circuit court's decision not to give an involuntary manslaughter instruction or in its determination that defendant knowingly exercised his decision to forego a voluntary manslaughter instruction.

Affirmed.

HARTMAN and HOURIHANE, JJ., concur.