2020 IL App (2d) 170517-U
No. 2-17-0517
Order filed November 10, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1791 |
| MICHAEL ZAKY BASSALY, | ) ) | Honorable Daniel P. Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly rejected defendant's request for an involuntary manslaughter instruction where no evidence supported a finding that defendant acted recklessly; the State's cross-examination questions and closing argument remarks did not deprive defendant of a fair trial.

¶ 2    In the direct appeal of his first-degree murder conviction, defendant, Michael Zaky Bassaly, raises two issues. The first is whether he should have received an involuntary manslaughter instruction where he testified that he lunged for a gun that his mother had placed to her temple, attempted to jam his finger between her finger and the trigger, and thereby caused the gun to discharge, unintentionally killing his mother. The second is whether he should be granted

a new trial where the State, in its closing argument, "relied heavily on propensity evidence to obtain a conviction" and "used a prior bad act not resulting in a conviction" to impeach defendant's testimony. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with the first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2011)) of his mother, Yvonne Bassaly. Defendant was convicted following a jury trial and sentenced to 55 years' imprisonment.

¶ 5     At the trial, Burr Ridge Police Officer Louis Moravecek testified that at about 12:53 a.m. on August 29, 2013, he received a dispatch regarding a possible gunshot victim at St. Mark's Coptic Church. The 911 caller reported that he had just shot his mom. Moravecek drove to the church and saw a parked, four-door Cadillac. Both rear doors were open, and defendant stood by the open rear passenger door holding a cell phone and a gun. When Moravecek told defendant to put the gun down, defendant complied and slid it toward Moravecek, who kicked it under the squad car for safety purposes.

¶ 6     Defendant stated that his mother had a pulse and asked for an ambulance. He was sobbing, and when Moravecek asked him what happened, he responded, "she made me do it" and "the gun went off." After a second officer, Corporal Glosky, arrived, Moravecek checked on the woman in the car, Yvonne Bassaly, who was seated upright in the backseat behind the driver's seat. Her head was slumped back and she was breathing, making a gurgling sound. Moravecek could see wounds on the right and left sides of her head, and there was blood. Moravecek advised dispatch that he had a gunshot victim and requested medical assistance.

¶ 7     Moravecek heard Corporal Glosky ask defendant what happened, and he responded, "along the lines of, she made me do it, she wanted me to do it." Moravecek then asked defendant if she

shot herself, and defendant said "no." Defendant asked Glosky to get an ambulance for his mom and also to look for an envelope and a flash drive that were in the car and to call the FBI. Moravecek then saw an envelope on the dashboard.

¶ 8 More officers arrived on the scene. As Moravecek put pressure on Yvonne's wound with gauze from a first aid kit, he heard defendant describe to Glosky "how he put the gun where his hand was, talked about where his finger placement was, said that he couldn't believe that he did it, and in describing his hand and finger placement, he said that -- he said, I shot her." Within approximately seven minutes, an ambulance arrived. Yvonne, who was still breathing, was taken to Hinsdale Hospital, and defendant was transported to the Burr Ridge Police Station. The parties later stipulated that Yvonne was pronounced dead at Hinsdale Hospital, and her body was transported to the Du Page County Coroner's Office.

¶ 9 Moravecek's squad car video and a transcription of the video were admitted and published to the jury. The parties stipulated that defendant's gun was recovered from under the squad car and contained one bullet in the chamber and fourteen bullets in the magazine.

¶ 10 Detective Jeffrey Romstedt, a forensic detective with the Du Page County Sheriff's Office, testified that he believed the passenger side doors of the Cadillac were open when he arrived at the scene at 2:02 a.m. He photographed the car and, at approximately 7:00 a.m., began collecting evidence pursuant to a search warrant. He recovered a sealed United States Postal Service envelope with "FBI" written on it from the front dashboard and a 9 mm Luger shell casing from the backseat of the car. He also recovered a fired bullet that appeared to have hair on it from the floor of the back seat behind the driver's seat. Romstedt observed a hole in the side lining of the pillar in the back seat behind the driver's seat. "You could see the foam behind the lining, as well

as what appeared to be brain matter." Romstedt also recovered a black purse and a brown briefcase from the front passenger's seat of the car.

¶ 11    Special Agent Louis Chesla of the Department of Homeland Security, Office of the Inspector General, testified that he investigates fraud and corruption against the department. Prior to August 29, 2013, Chesla was involved in an investigation into possible asylum fraud being committed by defendant and immigration attorney Robert DeKelaita. Chesla interviewed defendant as part of the investigation into DeKelaita, who was ultimately indicted and convicted of various offenses related to asylum fraud. After learning that defendant had been taken into custody on August 29, 2013, Chesla assisted in the search of defendant's apartment in Downer's Grove. As part of his investigation, Chesla reviewed documents and computers seized pursuant to the search warrant, as well as the envelope and a thumb drive recovered from the dashboard of the Cadillac.

¶ 12    Dr. Hilary McElligott, a forensic pathologist with the Du Page County Coroner's Office, testified she performed Yvonne's autopsy on August 29, 2013. Her external examination revealed no defensive injuries and no soot on Yvonne's hands. There was a contact range gunshot entrance wound on the right side of Yvonne's head, with visible soot. The entrance wound was above the right temple; the exit wound was straight across her head, on the left side. The cause of death was a gunshot wound to the head.

¶ 13    The parties stipulated that a Du Page County Crime Laboratory forensic scientist would render expert opinions that a full DNA profile from the hand grip of the gun matched defendant's DNA profile and a partial DNA profile from the end of the barrel was consistent with Yvonne's DNA profile.

¶ 14    Burr Ridge Police Officer John Helms testified that he received the items recovered from the Cadillac on August 29, 2013. He opened the sealed United States Postal Office envelope, which contained a signed two-page letter, seven copies of the same letter, and a USB flash drive. The envelope and its contents were admitted into evidence, and Helms read the two-page letter to publish it to the jury. Handwriting on the outside of the envelope says, "to the F.B.I." and "to F.B.I." The unedited typewritten letter states:

> "TO: the FBI and police, department of homeland security department of immigration and specially the Chicago asylum office located in 181 W Madison st. Chicago, IL 30th floor. ·
>
> If you are reading this letter that means I have killed my mother and myself, the reason for doing this is:
>
> I killed my mother to protect her from the result of the investigation as you are reading the letter and the evidence that I am providing, you will find out that I had no choice but to kill her to protect her. As for me every asylum case that I have done is fake there is about 120 to 130 cases none of them really happened. Egyptian would come to me I make up their story and apply for asylum for them and most stories are repeated more than once or twice or even more. If you think that is a lot well I am just a small guy. Included with the evidence a lot of recordings(**file named Robert in my google drive**) to attorney ROBERT W. DEKELAITA, he is the one who has been faking asylum cases for years with hundreds if not' thousands of fake ·cases, to give you an idea of how long he has been doing that, he did my mother and I asylum cases in 2002 and none of what is written in our cases is remotely true, he wrote it and gave it to my mother to memories, also he used to pay me to solicit clients for him and bill him as translation fees, he used to pay me 15% of whatever that client paid. He taught me a lot about faking cases and he is the one that introduced me to Mark Shoukhman the doctor who faked all the medical reports that some of the clients that I had and some of Robert's bought from him at $500 per report."
>
> Also Robert Dekelaita hides a lot of money from the IRS, whoever is reading this letter should ask the IRS to look into that, but this is not my issue.
>
> I got to the point where my conscious got the better of me and I could not stay silent, I had to report everything, knowing full well that is most likely I will spend the rest of my life in a jail cell or get killed by someone in the Egyptian community, I decided to take my own life.
>
> All the.evidence that the FBI and homeldnd security and ICE needs to investigates the cases that I have done and to investigate Robert dekelaita are located as follow: my

apartment 2035 prentiss Dr. C211 downers Grove, IL and most important my hard drive Of my laptop and my desktop and also on my Google drive and my Gmail accounts ( I have 2 accounts with Gmail, the main account that have all the evidence in it is Google drive is mikebassaly@grnail.com, password:fuckyoufuckyousamir        and the second account is mhdaurora@gmail.comPassword: m2994381808b but this one only email, there is nothing on the google drive for this account.

There is also on this laptop a copy of most if not all of the people I did fake statement and asylum for on an encrypted drive it is drive (f) to open it you have to do the following, open program called truecrypt, select the drive f and click mount the password is (29943818015911977731272 54459)

And in case you cannot open it, I left a folder on my desktop screen of my laptop with a copy of the same thing in the crypted drive. Folder called ( for the fbi and homeland security). I also sent a copy of this letter to CNN and the asylum office in Chicago and the FBI.

I hope that you investigate Robert W Dekelaita office too because he is 20 times worse than me, he does this on a massive scale for Egyptian and Iraqi and others.

Law office of Robert w dekelaita
5811 west dempster ave
Morton grove, il

Note: I know very well what I have done is wrong, I am sorry for what I have done."

¶ 15    Handwriting on page two of the letter states:  "I also include with this letter a USb drive that have some info" and, at the end, "God Bless USA," with the signature, "Michael Bassaly."

¶ 16    After the State rested, defendant moved for a directed verdict.  The trial court denied his motion as to the first degree murder charge and the allegation that he personally discharged a firearm, proximately causing the death of another.  The court granted defendant's motion with respect to the additional allegation that the murder was committed in a cold, calculated manner and pursuant to a pre-conceived plan.

¶ 17    Defendant testified that he was born a Christian in Cairo, Egypt, where he lived with his mother until he was about 14 years old.  They came to the United States in about 2001 because his mother wanted a better life for him, and they applied for asylum because his mother was "a little

afraid" of the Muslim Brotherhood, which persecuted Christians in Egypt. They were represented by attorney Robert DeKelaita. Their asylum petition contained untruthful statements.

¶ 18    After high school, and continuing until August 29, 2013, defendant worked for DeKelaita as a translator and also did translation work on his own. He falsified Christian Egyptian asylum cases mainly after the Egyptian revolution in 2011 when the Muslim Brotherhood took over most of Egypt. He wanted to aid Christian Egyptians, who were experiencing a "bloodbath, massacre." In 2013 he was under a lot of pressure because he learned that he was under investigation by the FBI and Homeland Security.

¶ 19    Defendant testified that he had a close relationship with his mother; his father died when he was young, and he has no brothers or sisters. His mother knew about the investigation and came to Chicago from her home in Florida to "deal with the problem" she and defendant had, namely, the fear that they would lose their green cards and be deported to Egypt and be killed.

¶ 20    On the day that his mother was shot, defendant met with his defense attorney and then returned to the hotel room in Naperville where he and his mother had been staying since the night before. Defendant ate and went to sleep and woke up at approximately 9:00 or 10:00 p.m. to his mother's crying. His mother wanted to pray and drove them both to St. Mark's church in the Cadillac defendant had bought for her.. Defendant testified that he had a gun and a FOID card and that the gun was in the dresser at the hotel; he did not bring it with him when they went to the church. He sat in the front seat of the car, and once they arrived at the church parking lot, his mother moved to the back seat to rest her head on the front seat headrest while she prayed.

¶ 21    Defendant testified that he sat in the front passenger seat waiting for his mother while she prayed. That is when she pulled out his gun, told him that she loved him and held the gun to her head. Defendant "jumped out of the front seat and *** went to the back seat to try to grab the gun

from her hand" by jamming his finger in the trigger to pull it away, and "the gun went off." Defendant then called 911 because he wanted to save his mother.

¶ 22 On cross-examination, defendant testified that he said, "I shot my mom" twice to the 911 dispatcher and that he also said, "I shot her in the brain." He did not tell the dispatcher that it was an accident. He had the gun in his hand when the first officer arrived because he took it from his mother. He told the officer that the "the gun went off," and when the officer asked, "how did it go off," he responded, "my mom wanted me to do it." Defendant did not tell the responding officers that it was an accident. He also testified that when asked if his mother shot herself, he responded, "no."

¶ 23 Defendant confirmed the contents of the envelope on the dashboard. He testified that he typed the letter a couple of days before the incident, signed it, and put it in the car. He further testified that he "exaggerated" about 120 or 130 asylum cases and that he did this for a living for about two and a half years. He "participated in a lie" and knew that it was wrong "in the way that it was fraud," but he was "okay" with "saving those people from what was happening at the time" in Egypt.

¶ 24 On re-direct examination, defendant testified that he did not use the word "accident" with the police officers on the scene because:

> I was - - my state of mind at the time was not something - - I mean, I just - - First of all, the gun went off, I just saw my mom - - You heard the sounds, you heard how my mom was and how she's - - I mean, I was - - all I was thinking about at the time was an ambulance. I wasn't like - - I felt - - The gun went off. I felt - - First of all, I felt guilt for - - for this just happened because of what I was doing. I felt that I just - - First of all, up to this day I don't know if the gun went off because of me trying to pull this gun from her or me trying to jam my finger or because of - - I - - I don't know, and I felt that guilt goes from me –
>
> * * *

And at the same time the first thing that was on my mind is get her some - - get her help. So, yes, I felt - - I felt guilt. I mean, I was - - I was - - I wasn't trying to justify myself at the time, I didn't really care, all I cared about was just getting some help for my mom.

¶ 25    During the instruction conference, defendant requested an instruction on involuntary manslaughter. In opposing the instructions, the State argued that if defendant's testimony that the gun accidentally went off were believed, then that would not constitute recklessness but rather an accident, and the verdict would be not guilty because defendant lacked the requisite mental state for first degree murder. The court agreed with the State and denied the request for an involuntary manslaughter instruction.

¶ 26    The jury found defendant guilty of first-degree murder and found proven the allegation that during the commission of the offense, defendant personally discharged a firearm that proximately caused death to another person.

¶ 27                                      II. ANALYSIS

¶ 28                              A. Involuntary Manslaughter

¶ 29    Defendant argues first that the trial court abused its discretion by denying his request for an instruction on involuntary manslaughter. According to defendant, his testimony that he "lunged for a firearm that was pointed at his mother's temple and attempted to jam his finger at the gun to block the trigger" shows that he acted recklessly. The State responds that defendant's testimony did not show he acted recklessly because his "alleged act of shoving his finger into the trigger area of the gun was deliberate and done for the purpose of trying to stop his mom from shooting herself."

¶ 30    Due process requires that a lesser-included-offense instruction be given when the evidence warrants such an instruction. *Hopper v. Evans*, 456 U.S. 605, 611 (1982). The court's examination of the evidence should focus on whether there was any evidentiary basis to support a conviction

of the lesser included offense. *Id.* "Although the lesser included offense doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense originally charged, it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973). Our supreme court recently stated that

> "the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some* evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is some *credible* evidence. It is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified. [Citations.] Requiring that credible evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury." (Emphases in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25.

¶ 31 We review for an abuse of discretion a trial court's decision that there is insufficient evidence to justify giving a jury instruction. *McDonald*, 2016 IL 118882, ¶ 42. An abuse of discretion occurs "where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* at ¶ 32.

¶ 32 The issue here is whether there was "some evidence" presented at trial, whether through express testimony or through inference from the testimony, that would have permitted the jury rationally to find defendant guilty of involuntary manslaughter. A defendant commits involuntary manslaughter when he "unintentionally, but recklessly, performs an act that is likely to cause death or great bodily harm to another." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 27 (citing

*McDonald*, 2016 IL 118882, ¶ 50); see 720 ILCS 5/9-3 (West 2017). Reckless conduct occurs when an individual "consciously disregards a substantial and unjustifiable risk that a result will follow and such disregard is a gross deviation from the standard of care that a reasonable person would exercise under the same circumstances." *Id*.; see 720 ILCS 5/4-6 (West 2017).

¶ 33    "A mental state is seldom proved by direct evidence and must generally be inferred from the surrounding circumstances." *People v. Lissade*, 403 Ill. App. 3d 609, 613 (2010). Here, defendant testified that when he saw his mother pointing the gun at her head, he "jumped out of the front seat and *** went to the backseat to try to grab the gun from her hand." According to defendant, he did not bring the gun with him when they went to the church. By jamming his finger in the trigger guard, he intended "to pull [the gun] away" before she shot herself. As alleged, defendant's urgent attempt to save his mother's life does not comport with his claim that he "*consciously disregard[ed]* a substantial *and unjustifiable* risk" that his conduct would result in her death. The evidence does not suggest he acted in conscious disregard of a risk. To the contrary, according to his testimony, he was attempting to eliminate, or at least mitigate, a risk by getting the gun away from his mother. Moreover, an inference may be drawn from defendant's testimony that the risk was justified by his urgent need to save his mother. See *People v. Callaham*, 60 Ill. App. 3d 1020, 1025 (1978) ("[t]he question remain[s] *** whether th[e] risk was justifiable or reasonable under the circumstances"). Because defendant did not act recklessly as defined under the statute, we do not believe the trial court abused its discretion in denying his request for involuntary manslaughter instructions.

¶ 34    Citing *People v. Luckett,* 339 Ill. App. 3d 93, 101 (2003), defendant argues that "[p]roviding instructions on a defense supported by the evidence 'enables the jury to use the applicable law in making a full and fair evaluation of the competing theories presented by the State

and the defense.' " Here, however, the defense of involuntary manslaughter is not supported by the evidence, and the trial court correctly determined that instructions on this theory would not be appropriate. See *People v. McDonald*, 2016 IL 118882, ¶ 42 (the decision that there is insufficient evidence to justify giving an instruction lies within the trial court's discretion).

¶ 35    Defendant argues that Illinois courts have "repeatedly held that evidence a decedent was killed during a struggle over a firearm supports a finding of recklessness," citing *People v. Consago*, 170 Ill. App. 3d 982 (1988), *People v. Robinson*, 163 Ill. App. 3d 754 (1987), and *People v. Sibley*, 101 Ill. App. 3d 953 (1981). However, in *People v. Castillo*, 298 Ill. App. 3d 839 (1998), the court factually distinguished *Consago* and *Sibley* on grounds that are  equally applicable here. In those cases, "the defendant was entitled to a recklessness instruction when *defendant* introduced a gun into the argument, pointed the loaded gun at another, and then the gun was discharged after a struggle." (Emphasis added.)  *Castillo*, 298 Ill. App. 3d at 844-45 (citing *Consago*, 170 Ill. App. 3d at 986 ("defendant drew a gun from desk drawer and victim killed by bullet as she reached for the gun"), and *Sibley*, 101 Ill. App. 3d at 956 ("defendant, who had drawn gun and held it on father, shot boy when struggling with boy's father")). Here, according to defendant's own testimony, he did not bring his gun to the church but, rather, his mother did, and it was she who introduced the weapon during her prayers. Thus, *Consago* and *Sibley* are distinguishable from this case.

¶ 36    *Robinson* is distinguishable on a different factual basis: although a person other than the defendant produced the weapon, the defendant claimed that he struggled with that person in self-defense. No such struggle occurred in this case. Indeed, all three of defendant's cases are distinguishable in that each involved a *struggle* over a weapon. Defendant's testimony in this case does not suggest resistance on the part of his mother, or any struggle whatsoever between defendant and his mother.

¶ 37     Defendant also argues that it was the trial court's function to determine whether his conduct was accidental or reckless, citing *Consago*, 170 Ill. App. 3d at 986. An accident, however, "is not to be equated with recklessness." *People v. Olivieri*, 2016 IL App (1st) 152137, ¶ 28 (insufficient evidence supported reckless discharge of a firearm where defendant accidentally pulled trigger while attempting to unload pistol). Although the *Consago* court stated that the distinction between recklessness and accidental "is generally one for the trier of fact," it also stated that a defendant "is entitled to a jury instruction on manslaughter *if the record sets forth a basis for it*." (Emphasis added.) *Id*. Because we find that the record in this case does not set forth a basis for giving an instruction on involuntary manslaughter, we reject defendant's argument that he was improperly denied the opportunity to have the jury instructed on his theory of the case.

¶ 38     As to whether the record supports a finding that defendant's conduct was accidental, we will not substitute our judgment for that of the jury. See *People v. Banks*, 287 Ill. App. 3d 273, 286 (1997) ("It is the function of the jury to determine the credibility of the witnesses and assess the weight to be afforded evidence, and we may not lightly set aside such findings, nor substitute our own judgment for that of the jury."). The jury heard defendant's testimony, as well as his counsel's arguments, that the shooting was accidental. It also considered defendant's letter to the FBI; his statements to the 911 operator and the police at the scene; DNA evidence on the gun showing that defendant, not his mother, handled it; and the forensic pathologist's testimony that defendant's mother did not have soot on her hands. Ultimately, the jury rejected the possibility that defendant accidentally killed his mother by finding him guilty of first-degree murder beyond a reasonable doubt and finding proven that, during the commission of that offense, defendant personally discharged a firearm that proximately caused death to another person.

¶ 39                     B. Admission of Asylum Fraud Evidence

¶ 40   Prior to trial, the State moved to admit defendant's two-page letter describing his involvement in the asylum fraud scheme as proof of defendant's motive for killing his mother.  At the hearing on the motion, the court and both parties agreed that the letter was relevant and admissible at trial, subject to the requisite foundation and a limiting instruction because defendant was never charged with fraud.  Defendant now argues that he was deprived of a fair trial by the State's closing argument comments and cross-examination questions regarding defendant's asylum fraud activity.  The State replies that defendant failed to preserve his arguments for review and can establish neither that error occurred nor that any "plain error" was so serious that it prevented him from obtaining a fair trial.

¶ 41   Our supreme court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill.2d 455, 470 (2005).  Defendant concedes that he did not object to the prosecutors' closing remarks or cross-examination questions at trial and did not raise these issue in his post-trial motion.  Accordingly, defendant has forfeited his claims. *Id*.

¶ 42   The plain error rule, however, allows a reviewing court to address a forfeited error affecting substantial rights in two circumstances:  (1) where the evidence in a case is so closely balanced that the jury's guilty verdict might have resulted from the error and not the evidence and (2) where the error is so serious that the defendant was denied a substantial right and the consideration of the forfeited error would uphold the validity of the judicial process.  *People v. Herron*, 215 Ill.2d 167, 178–79 (2005.  Here, defendant argues only the second prong of the plain error doctrine.  Under this prong, "the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process."

*Id.* at 187. "Prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence." (Emphasis and internal quotation marks omitted.) *Id.*

¶ 43     We must first, however, determine whether error occurred at all. *People v. Sims*, 192 Ill. 2d 592, 621 (2000).   In reviewing defendant's allegations of prosecutorial misconduct, it is appropriate to examine the closing arguments of both parties in their entirety and place the complained-of comments in their proper context. *People v. Cisewski*, 118 Ill. 2d 163, 175–76 (1987).  The supreme court has held that our review is *de novo*. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*.").  It has also held that the appropriate reviewing standard is abuse of discretion, reasoning that "the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993); see also *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (applying an abuse of discretion standard).  We need not resolve this issue, however, as our holding in this case would be the same under either standard.  See *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009).

¶ 44     Twice during the trial, and again at the end, the trial court instructed the jury that it could consider the evidence relating to asylum fraud only for the limited purpose of motive.  The State argues, and defendant does not dispute, that both parties relied on this evidence to support their theories of the case:  the State's theory was that "defendant planned to kill his mother and himself to avoid the consequences of his involvement in multiple asylum fraud cases"; defendant's theory was that "his mother came to Illinois to visit him because she was distraught over the asylum fraud investigation and its possible impact on her and defendant, and that this led her to attempt to take her own life."  The State further notes that, during the trial and in his closing argument, defendant

correlated his efforts to save persecuted Christian Egyptians with his attempt to save his mother's life.

¶ 45    On direct examination, defendant testified that he falsified applicant's statements in asylum cases because Christians in Egypt were suffering a "bloodbath" and "massacre" after the Muslim Brotherhood took over most of Egypt, and he wanted to help them.  On appeal, defendant objects to the following cross-examination questions:  (1) "Because basically what you did was you committed a fraud upon the asylum officers or basically this country; isn't that correct?" and (2) "Okay.  So you thought the rules could be bent as long as you liked [sic] them, correct?"  We disagree with defendant that these questions had no relevance to his motive under the State's theory that he intended to kill his mother and himself to "avoid the consequences of his involvement in multiple asylum fraud cases."  We further find the questions to be responsive to defendant's testimony that he falsified the applications because he wanted to help Christian Egyptians.  See *Beard v. Barron*, 379 Ill. App. 3d 1, 17–18 (2008) ("The scope of cross-examination does not refer to the actual material discussed during direct examination, but rather to the subject matter of the direct examination.").

¶ 46    In his letter to the FBI and on cross-examination, defendant conceded that "it was a fraud" to falsify applicant's statements in 120-130 cases, but he was "okay" with "saving those people from what was happening at the time" in Egypt.  He further admitted that he basically altered the statements for a living.  On appeal, defendant contends that the following closing remarks were not limited to motive:  (1) "[Yvonne] didn't participate in any asylum fraud.  She didn't 120 times walk in and deceive.  No her crime for which her life should be sacrificed is the cowardice [sic] acts of her son"; (2) "asylum fraud, why it's telling fake sympathetic stories to get what you want.

Telling fake sympathetic stories to get what you want, something the defendant practiced for years for a living, over 120 times"; and (3) "Sell the sad story. And that was just to make money."

¶ 47 Again, we cannot say that these remarks were unrelated to defendant's motive under either parties' theory of the case. Nor were they otherwise unfair. See *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) ("[a] prosecutor has wide latitude in making a closing argument [and] may comment on the evidence and any fair, reasonable inferences it yields, even if such inferences reflect negatively on the defendant" (citations omitted)).

¶ 48 Defendant's closing argument contained the following remarks:

"So Mike falsifies 120, 130 asylum petitions. Why does he falsify these petitions? Because Christians in Egypt are being vilified because they're being persecuted, and that's a fact. Christians are persecuted. They are -- you know, how do you say, tortured. The Muslims in Egypt were not very supportive of the Christian religion, and so he felt he was helping other Egyptians. And, yes, he justified falsifying these petitions in that regard, so this makes Mike Bassaly a horrible person. Terrible guy."

The closing argument also related that defendant's attempt to prevent his mother from killing herself in the backseat of the car resulted in a "horrible situation, horrible accident."

¶ 49 Defendant objects to the following passage in the State's rebuttal argument:

"he did this morning what he did at least 120 times in front of the asylum officer, he perpetrated a fraud. He had no problem coming in, telling a story to get what he wanted. Do you know what? Because in his mind I want to protect these Egyptian people even though they don't fit the rules of asylum, you know what, that's what I want, so I'm going to twist the rules, bend the rules, tell a little lie because I'm going to get what I want. So

do you really think he had any problem coming in front of Judge Guerin and you and pretending to take an oath and telling you a story to get what he wants? Absolutely not."

¶ 50 Even if overstated, these remarks were responsive to defendant's arguments that he saved Christian Egyptians and his only motive was to save his mother. *Nicholas*, 218 Ill. 2d at 121. To the extent that the State's remarks were directed to defendant's credibility in maintaining that the death was an accident, they were not improper. See *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12 (prosecutor may comment on the evidence and "reasonable inferences from the evidence, including a defendant's credibility or the credibility of the defense's theory of the case").

¶ 51 Having carefully considered the unpreserved remarks and the cited authorities, we find that defendant's claims of error are largely without merit. The complained of comments were relevant to motive, invited by defendant's testimony or his counsel's arguments, or legitimate inferences drawn from the evidence, including credibility. We further find that, to the extent the prosecutor may have exceeded the bounds of proper argument, any error was cured by instructing the jury that its consideration of the asylum fraud evidence was limited to motive, and admonishing it that "closing arguments are not evidence, that they were to disregard any comments not supported by the evidence, and by receiving written instructions to the same effect." *People v. Ivey*, 267 Ill. App. 3d 310, 311 (1994). See also *People v. Wilmington*, 2013 IL 112938, ¶49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.") In particular, the limiting instruction was necessary to ensure that the jury considered this evidence only on the issue of motive and not as evidence of defendant's criminal propensity. See, e.g., *People v. Mullins*, 242 Ill. 2d 1, 16 (2011) (instructing jury to consider evidence of the defendant's prior convictions for the limited purpose of impeachment *** "ensures that the jurors understood the narrow reason for which the convictions were admitted").

¶ 52    Finally, defendant contends that his counsel was ineffective for failing to object to the State's arguments.  To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant; more specifically, defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *People v. Cherry*, 2016 IL 118728, ¶24. Defendant must satisfy both prongs of the *Strickland* test to prevail.  *Cherry*, 2016 IL 118728 at ¶24.

¶ 53    Defendant cannot satisfy either prong.  As noted above, the evidence related to the fake asylum cases was central to the defense trial strategy, and defendant has not demonstrated that he was prejudiced by counsel's failure to object to closing argument comments or cross-examination questions.  Accordingly, defendant's ineffective assistance claim is without merit.

¶ 54                                     III. CONCLUSION

¶ 55    For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 56    Affirmed.